Argued and submitted September 6, 1990, the decision of the Court of Appeals and the modified order of the Teacher Standards and Practices Commission reversed and case remanded to Commission for further consideration December 12, 1991

## RAPHAEL LEO REGUERO,
*Petitioner on Review,*

*v.*

## TEACHER STANDARDS AND PRACTICES COMMISSION,
*Respondent on Review.*

## (CA A48106; SC S37126)

822 P2d 1171

Barbara J. Diamond, of Bennett & Durham, Portland, argued the cause for petitioner on review. With her on the petition was Mark Toledo, Portland.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the response to the petition were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

UNIS, J.

## UNIS, J.

This case involves judicial review of an order of the Teacher Standards and Practices Commission (TSPC), a state administrative agency. TSPC issued a modified order[1] denying petitioner's application to reinstate his teaching license.[2] The Court of Appeals affirmed the modified order. *Reguero v. Teacher Standards and Practices*, 101 Or App 27, 789 P2d 11 (1990). We allowed limited review to decide two issues: (1) whether TSPC adequately defined the term "good moral character" and thereby provided petitioner with clear notice of what conduct was a basis for denial of reinstatement of his teaching license, and (2) whether the record contains substantial evidence to support TSPC's findings of fact. We reverse the decision of the Court of Appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner taught sixth grade in the Salem-Keizer School District (District) during the 1985-86 and 1986-87 school years. The District terminated his employment in January 1987. In October 1987, he applied to TSPC to reinstate his Oregon teaching license, which had expired in August of that year. At petitioner's request and pursuant to ORS 342.143[3] and ORS 183.413 *et seq*, TSPC held a contested case hearing in 1988 to determine whether, at that time, petitioner had good moral character and was fit to serve as a teacher.

■ Upon TSPC's receipt of petitioner's application for a teacher's license, TSPC's attorney conceded that petitioner at least *prima facie* met the eligibility requirements for a teaching license. TSPC then introduced evidence to support its allegations that petitioner had engaged in inappropriate sexual conduct involving Michelle and Leasa, two female

---

[1] TSPC withdrew the original order and issued a modified order. *See infra* note 25.

[2] The 1991 Oregon Legislature authorized changing the term "teaching certificate" to "teaching license" throughout the statutes. Or Laws 1991, ch 662, § 7.

[3] ORS 342.143(2) provides:

"The Teacher Standards and Practices Commission may also require an applicant for a teaching license to furnish evidence satisfactory to the commission of good moral character, mental and physical health, and such other evidence as it may deem necessary to establish the applicant's fitness to serve as a teacher."

students in petitioner's sixth-grade class. Neither Michelle nor Leasa testified. To support its allegations, TSPC introduced hearsay and multiple hearsay testimony[4] that petitioner had touched Michelle's breast on one occasion and her buttocks on another occasion. TSPC also introduced hearsay and multiple hearsay testimony that petitioner had kept Leasa after school in September, locked her in the classroom, touched her "on the breast and in the vaginal area," and lowered his trousers. In addition, there was hearsay and multiple hearsay testimony that students had complained, among other things, that petitioner made them feel uncomfortable, stood too close to them, discussed inappropriate topics (such as "french kissing") with them, and used gestures and winks that appeared sexual.

Petitioner presented countervailing evidence. He admitted touching Michelle's breast, but said that the contact was inadvertent. With respect to Leasa's complaint of a sexual assault, he contended that she had fabricated the story to punish him for telling the school counselor that Michelle, who was her friend, was involved with prostitution and drugs. A school employee testified that she had overheard Michelle say, "I'm gonna get [petitioner]." Two teachers testified that the doors of the classrooms could not be locked from the inside. A teacher's aide testified that she was usually present in petitioner's classroom after school and had never seen him alone with Leasa.

After the hearing, TSPC issued a modified order.[5] TSPC found that petitioner had engaged in inappropriate sexual behavior involving Michelle and Leasa.[6] TSPC's findings relating to petitioner's sexual contact with Michelle and

---

[4] As used in this opinion, the term "hearsay" means "a statement, other than one made by the declarant while testifying at the * * * hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). "A 'declarant' is a person who makes a statement." OEC 801(2). The phrase "multiple hearsay" or "hearsay within hearsay" refers to hearsay (e.g., police report) that contains within it another level (or levels) of hearsay (e.g., a bystander's statement). For an illustration and discussion of multiple hearsay, see State v. Pinnell, 311 Or 98, 117 n 29, 806 P2d 110 (1991). See also Westling, Evidence, §§ 47.1-47.4 (Oregon CLE 1986).

[5] See supra note 1.

[6] The record suggests that Michelle and Leasa were 11 or 12 years of age at the time of the alleged sexual contact. Because neither young girl testified, we cannot be sure even of this fact.

Leasa are as follows:

"15. On December 2, 1986, Officer John [*sic*] Costelow interviewed Michelle * * *, a former student of petitioner. Michelle * * * told Officer Costelow that in April or May 1986, petitioner had reached behind his shoulder while seated and intentionally grabbed her by the breast. Michelle * * * also told Officer Costelow that in August or September 1986, petitioner had placed his hands on her buttocks. In his testimony, petitioner stated that Michelle * * * had hugged him from behind and that he had reached back and inadvertently touched her breast. The panel finds that petitioner inappropriately reached behind him and touched the student on the breast and that this act was intentional.

"16. In September 1986, petitioner was in his classroom alone with Leasa * * *, a sixth-grade student. On that occasion, petitioner touched the student's body without her permission and in a manner that petitioner intended to be sexual. Petitioner told the student not to be afraid if petitioner touched the student in places he wasn't supposed to. Petitioner's actions were very upsetting to the student.

"17. On December 2, 1986, Leasa * * * was interviewed by Officer John [*sic*] Costelow of the Salem Police Department. The interview took place in the presence of Lori Minette, the school counselor at Highland Elementary School. Leasa stated that in September of that year petitioner had asked her to stay after school. Leasa stated that while in the classroom, petitioner touched Leasa on the breast and in the vaginal area. Leasa further stated that at one point petitioner lowered his trousers. She further stated that when she struggled and kicked at petitioner he then allowed her to leave the classroom. Leasa * * * was subsequently interviewed about this incident on two occasions by Sarah Castner, Deputy District Attorney for Marion County. Each time Leasa was interviewed she described the incident consistently, but she stated to Ms. Castner that the touching of her breast may have been an accident and that she did not want to talk about or could not remember the touching in her vaginal area.

"* * * * *

"19. On December 4, 1986, Officer Costelow interviewed petitioner about the allegations of Leasa * * *. Petitioner denied the allegations and stated that all the girls of Leasa's age are 'in heat.'

"* * * * *

"22.   On the afternoon of February 24, 1987, petitioner spoke with Stacey * * *, a sixth grade student in petitioner's class[,] while the student and her mother * * * were seated in [the mother's] car. This conversation lasted nearly two hours. Petitioner stated that Leasa * * * had made up the accusations against him and that as a result petitioner had lost his job and was unable to make his house payments. Petitioner stated that his wife had used the allegations against him to deprive him from visiting with his two-year-old son. He stated that he had considered committing suicide by taking an overdose of pills, and that the only reason petitioner had not done so was that he would not want to have his death to be on Leasa's conscience. In denying the allegations, petitioner told Stacey * * * that if he were going to make sexual advances to a female student, he would not have chosen a girl such as Leasa[,] who was not very pretty; that he would have chosen one of the better-looking girls in the class such as Stacey. Petitioner encouraged Stacey * * * to talk to the other girls in the sixth grade class about all of the problems he was having and try to get the other girls to be on his side.

"23.   On the night of February 24, 1987, Leasa * * * and her friend * * * called petitioner after the two girls had spoken with Stacey * * *. During this telephone conversation, petitioner repeated to the girls the terrible things that had happened to him as a result of Leasa's statements, including the fact that petitioner had contemplated suicide. Petitioner urged Leasa to withdraw her allegations.

"24.   On February 25, 1987, Leasa * * * and [her friend] went to see the school counselor, Lori Minette. Leasa * * * told Ms. Minette that Leasa wanted to withdraw her statement against petitioner. Leasa * * * told Ms. Minette that the statements were still true, but that she was tired of all the problems created and felt that petitioner had suffered enough. At no point did Leasa say that the events described had not happened.

"* * * * *

"27.   Tanya Melsha was a student aide in petitioner's classroom during the first semester of the 1986-87 school year. Tanya Melsha was usually present in petitioner's classroom during the school day, but she was not always present in the classroom after the school day was over."

TSPC also found that petitioner had: put his arm around female students (Finding No. 7); repeatedly stood

close to female students in his classroom and hovered over the backs of his students, with his hands on their desks, in a way that made them uncomfortable (Finding No. 8); frequently used sexual words, gestures, and winks toward his students (Finding No. 9); discussed "french kissing" with his students and asked whether they had "sucked face" (Finding No. 10); tapped a student on the buttocks with a yardstick, commenting that she was looking nice (Finding No. 11).

TSPC drew these conclusions of law:

"* * * * *

"3.    Petitioner's repeated acts of inappropriate contact with female students, his discussion of inappropriate sexual topics, and his employment of sexually suggestive words, gestures, and expressions constitute gross neglect of duty and a serious and material breach of professional responsibilities. Petitioner's actions demonstrate a serious failure to employ professional judgment in violation of OAR 584-20-010(5). This conduct also constitutes gross unfitness.

"4.    Petitioner's sexual contact with Leasa * * * constitutes gross neglect of duty and gross unfitness.

"5.    Petitioner is guilty of gross neglect of duty and gross unfitness based on his efforts to persuade female students from his class, including Leasa * * *, to withdraw the allegations against him. This conduct also violates OAR 584-20-035(1)(b)[,] which requires an educator to refrain from exploiting professional relationships with any student for personal gain, or in support of persons or issues.

"6.    Any of these specifications in paragraphs 3, 4, and 5 above, are sufficient alone to support the conclusion that Petitioner is guilty of gross neglect of duty and gross unfitness."

Therefore, TSPC's modified order concluded that petitioner "lacks good moral character to serve as [a] teacher" and denied petitioner's application for an Oregon teaching license.[7]

---

[7] TSPC determined that petitioner "is not entitled to reapply for certification until one year after the date of the order."

## II. ADEQUACY OF AGENCY'S RULES

We first turn to petitioner's assignment of error that TSPC did not adequately define the term "good moral character" in ORS 342.143(2).[8] The Court of Appeals held that the modified order adequately interpreted the term, because it defined lack of good moral character "by reference to the rule pertaining to gross unfitness and to gross neglect of duty, which the Commission found petitioner violated." *Reguero v. Teacher Standards and Practices, supra,* 101 Or App at 31. Petitioner relies on *Ross v. Springfield School Dist. No. 19,* 294 Or 357, 657 P2d 188 (1982) (*Ross I*). In *Ross I, supra,* 294 Or 367-69, this court held that the Fair Dismissal Appeals Board had to provide an interpretation, either by rulemaking or in a contested case, of the statutory term "immorality."

To this court, TSPC raised the issue whether it was required to define "good moral character" solely by rulemaking. TSPC's conclusion that it might be bound to define "good moral character" by rule before applying the term in a contested case rests on its categorizing "good moral character" as a delegative term rather than as an interpretative term.[9] Even if "good moral character" is a term of delegation that requires pre-decisional rulemaking, however, TSPC did all that it was required to do in this case.

■ TSPC adopted a rule, OAR 584-20-040,[10] that set out the criteria for denial of a license under ORS 342.143. Among the disqualifying grounds were "gross neglect of duty" and "gross unfitness." OAR 584-20-040(3) and (4). Petitioner does not claim that the rule was insufficient to define gross

---

[8] *See infra* note 10.

[9] In *Springfield Education Assn. v. School District,* 290 Or 217, 621 P2d 547 (1980), this court summarized the division of statutory terms into three classes. Each class conveys to the agency different responsibilities for definition. The first class, terms of precise meaning, requires the agency only to apply the terms to the facts. The second class, inexact terms, comprises a complete expression of legislative policy and requires the agency to interpret the legislature's meaning, either by rule or in a contested case. The third class, terms of delegation, is incomplete legislation that the agency is authorized to complete, by making rules within the range of discretion established by the statutes. *Id.* at 223.

[10] OAR 584-20-040(2), after 1989 revision not applicable to this case, specifically identifies engaging in "gross neglect of duty" or "gross misconduct" as a failure to meet the requirement of ORS 342.143, "good moral character." This opinion, however, uses the 1987 rule in effect prior to and at the time of the contested case hearing.

neglect of duty and gross unfitness. *See* ORS 342.175(1) (containing those terms). Rather, he contends that the rule was not an adequate interpretation of the statutory phrase, "good moral character" in ORS 342.143(2).[11]

The rule was TSPC's express attempt to explain, among other things, lack of "good moral character." OAR 584-20-040(2) provided:

"The Commission may initiate proceedings to suspend or revoke the [license] of an educator under ORS 342.175 *or deny a [license] to an applicant under ORS 342.143* who:

"* * * * *

"(c) Is charged with gross neglect of duty;

"(d) Is charged with gross unfitness." (Emphasis added.)

The rule went on to define each of those concepts in detail. In turn, the definitions included various items that bear on one's moral character: for instance, knowing falsification of documents was an example of gross neglect of duty (OAR 584-20-040(3)(c)); fraud or misrepresentation indicating a lack of personal integrity was an example of gross unfitness (OAR 584-20-040(4)(b)). ORS 342.143, which TSPC cites as one of the statutes whose terms it was defining, provides that TSPC may require an applicant for a teaching license to furnish not only satisfactory evidence of proper educational training, but also "evidence satisfactory to the commission of good moral character." In other words, TSPC expressly intended that its rule defining "gross neglect of duty" and "gross unfitness" covers lack of "good moral character."

The next question is whether TSPC could properly interpret "good moral character" in that way. ORS 342.143(2) authorizes TSPC to determine "an applicant's fitness to serve as a teacher," including a determination of the applicant's "good moral character." ORS 342.165(1) grants TSPC the authority to make rules necessary for the denial of licenses under ORS 342.143. ORS 342.175(1) provides that TSPC may act to suspend or revoke a teaching license, or discipline a teacher, for various reasons. Among them are

---

[11] Petitioner does not challenge TSPC's authority to make a rule defining "good moral character."

"gross neglect of duty," ORS 342.175(1)(b), and "any gross unfitness," ORS 342.175(1)(c). ORS 342.175(5) goes on to provide: "Violation of standards adopted by the commission relating to competent *and ethical* performance of professional duties shall be admissible as evidence of gross neglect of duty or gross unfitness." (Emphasis added.)[12] That wording suggests that TSPC's rules concerning gross neglect of duty and gross unfitness may encompass teachers' ethical behavior and, inferentially, moral character. Under those statutes, TSPC's rule, which expressly made the grounds for revoking and for denying licenses the same, and which considered gross neglect of duty and gross unfitness to be forms of lack of good moral character, was a permissible exercise of its rulemaking authority.

■　　If petitioner means to suggest that TSPC must define all aspects of good moral character, even though the agency relied on only two aspects defined by rule, then he is wrong. As this court reasoned in *Megdal v. Board of Dental Examiners*, 288 Or 293, 314, 605 P2d 273 (1980), requiring an agency to make rules for delegative terms "serves the two purposes of giving notice of censurable conduct and confining disciplinary administration to the announced standards." The existing rules provided petitioner with notice as to what conduct is censurable. TSPC acted within the confines of the announced standards.

## III. TESTIMONY RELIED ON AT THE HEARING

Our disposition of this case requires analysis of the evidence relied on by TSPC to deny petitioner's application for a teaching license. There was no direct testimony by Michelle or Leasa. The particular items of hearsay[13] (H) and hearsay within hearsay (HH) testified to by Deputy District

---

[12] TSPC's rules also define competent and ethical performance of professional duties. OAR 584-20-035 defines what one must do and refrain from doing to be an "ethical educator." OAR 584-20-010 through 584-20-030 define what is required of a "competent educator." The rule concerning "the ethical educator" includes items that fall within the common understanding of the concept of "good moral character." For example, an ethical educator will exemplify personal integrity and honesty. OAR 584-20-035(3)(a).

[13] References in this opinion to "challenged hearsay" include both hearsay and hearsay within hearsay (multiple hearsay or multi-level hearsay).

Attorney Castner, Counselor Minette, and Officer Costelow, *on which TSPC based its findings of fact,* follow.[14]

A. *Testimony of Marion County Deputy District Attorney Susan Lynn Castner*

Castner testified:

Leasa told her that she (Leasa) stayed after school one day and that petitioner touched her breast, but "I think it was an accident." (H)

When she (Castner) asked Leasa why she ran to the door, Leasa said, "I just wanted to get out," but "the door was locked."[15] (H)

Leasa said that petitioner told her (Leasa), "Don't be scared if I do something — if I touch you in a way I shouldn't." (HH)

Leasa said that petitioner unzipped his pants and dropped them, and that petitioner let her (Leasa) go when she kicked him. (H)

The police report states that Leasa told the police officer that petitioner touched her in the vaginal area. (HH)

When she (Castner) asked Leasa whether petitioner had ever touched her in the vaginal area, Leasa responded, "I don't remember" and "I don't want to talk about it anymore." (H)

Officer Costelow informed her (Castner) that school counselor Lori Minette had said that Leasa had said that petitioner talked to her and that Leasa was "taking back what she said." (HH)

---

[14] TSPC's finding of fact "26" states: "Witnesses Costelow, Minette, and Castner all have extensive experience in working with juveniles. All three witnesses have interviewed a large number of children, including children who have been victims of sexual abuse."

In its opinion TSPC states: "The panel found the testimony of witnesses Costelow, Castner and Minette to be *credible and persuasive.*" (Emphasis added.)

*See infra* note 25.

[15] As will be discussed *infra,* there was testimony that the door could not be locked from the inside.

On cross-examination, Castner admitted that before the grand jury, the only time Leasa was under oath, Leasa had no recollection that petitioner had touched her in her vaginal area.

B. *Testimony of School Counselor Lori Minette*

Minette testified:

Althea, a student, told Costelow that "other girls might have had" a "problem with sexual involvement on the part of [petitioner]." (HH)

Leasa told Costelow in her (Minette's) presence that when petitioner touched her breasts, she (Leasa) kicked petitioner and "he said 'okay, you can go,' and [that] he [petitioner] accompanied her toward the door and walked down the hall." (H) and (HH)

Leasa told Costelow that "she tried to go to the door but couldn't get out" because "the door was locked." (H)

Leasa told her that what she (Leasa) had said about petitioner was not true and that she (Leasa) "wanted the matter to be over for her." Later, Leasa told Costelow, however, that what she had told Officer Costelow was true. (H)

C. *Testimony of Salem Police Officer Jon Costelow*

Costelow testified:

Michelle said that petitioner touched her on the breast and buttocks. (H)

Michelle said that Leasa told her that she (Leasa) had touching problems with petitioner. (HH)

The police report he prepared stated that Leasa did not want to tell him what happened. (HH)

Leasa wanted to recant her story about petitioner because petitioner told her that "he was going to kill himself, overdose on sleeping pills, that he couldn't pay his rent." (H)

Angela, Leasa's best friend, said that petitioner's attorney told her (Angela) that petitioner was

having his visitation privileges concerning his son taken away. (HH)

Leasa told him (Costelow) that petitioner urged her to recant her "story" about petitioner. (HH)

A 25-page police report, prepared by Costelow, was received in evidence. That report summarized Costelow's investigation of the accusations against petitioner and included statements made by Michelle, Leasa, and other students. (HH)

## IV. SUBSTANTIALITY OF THE EVIDENCE

We now consider whether TSPC's findings about sexual contact with Michelle and Leasa are supported by substantial evidence. Petitioner's primary claim is that TSPC may not rely entirely on hearsay that would not be admissible in a civil or criminal trial to support findings that petitioner had sexual contact with the students, when TSPC did not show that they were unavailable to testify.[16] Petitioner asserts that such hearsay, in such circumstances, does not constitute substantial evidence. He urges us to adopt the "residuum rule," at least in cases where direct evidence is available.

### A. *Residuum Rule*

■ The New York Court of Appeals created the residuum rule in *Carroll v. Knickerbocker Ice Co.*, 218 NY 435, 113 NE 507 (1916). 3 Davis, Administrative Law Treatise 239, § 16.6 (2d ed 1980). In that case, the court set aside a workers' compensation award that was based solely on a deceased worker's statements that he had been injured on the job. The relevant statute provided that "common law or statutory rules of evidence" were not binding on the agency that administered workers' compensation. 218 NY at 440. The court interpreted that statute to mean that, although the agency could "accept any evidence that is offered[,] still in the end there must be a residuum of legal evidence to support the claim before an award can be made." *Id*. The residuum rule

---

[16] The parties appear to agree that Michelle and Leasa were available to testify. As noted above, TSPC does not contend that the students' out-of-court statements would have been admissible in a civil or criminal trial.

requires that an administrative agency's findings be supported by some evidence that would be admissible in a civil or criminal trial. Under the residuum rule, a finding based solely on hearsay that would not be admissible in a civil or criminal trial could never be supported by substantial evidence in the whole record. 3 Davis, *supra*, at 239, § 16.6.

Some jurisdictions retain the residuum rule.[17] Courts that adopt the rule do so in an effort to ensure reliability of evidence and cross-examination of witnesses. But legal scholars, including McCormick, Wigmore, and Davis, have severely criticized the rule and those rationales for it.

First, McCormick reasons that courts concerned about cross-examination fail to consider that

> "much 'legal' evidence within the hearsay exceptions is equally untested. Yet the latter is accepted even in jury trials because of its probable reliability. Consequently the residuum rule's mechanical prohibition against uncorroborated hearsay is unsound. Its sound objectives can be secured through the sensitivity of the hearings officers and the wise application of the substantial evidence test which measures the quantity and quality of the supporting evidence regardless of its category or label."

McCormick, Evidence 1017, § 354 (3d ed 1984).

Second, the residuum rule is predicated on the assumption that hearsay evidence that would be excluded in a civil or criminal trial is inherently unreliable. 3 Davis, *supra*, at 243. That assumption is not always correct. As McCormick notes, "[t]he trustworthiness of hearsay ranges from the highest reliability to utter worthlessness." McCormick, *supra*, at 914.

Third, Wigmore criticizes the residuum rule for resting on the fallacy that requiring a residuum of "legal" evidence will help ensure the truth of the findings. The rules for admitting evidence in civil or criminal trials are not necessarily or exclusively designed to ensure truth, however.[18]

---

[17] *E.g., Matter of Tenure Hearing of Cowan*, 244 NJ Super 737, 541 A2d 298 (App Div 1988); *Tallman v. ABF (Arkansas Best Freight)*, 108 NM 124, 767 P2d 363 (1988); *Mayes v. Department of Employment Sec.*, 754 P2d 989 (Utah App 1988).

[18] For example, privileged communications, which by usual evidentiary

Wigmore concludes that the residuum rule is "decidedly not the wise and satisfactory rule for general adoption." 3 Davis, *supra*, at 242 (quoting Wigmore, *supra*, at § 4b).

Finally, Davis argues that courts often fail to recognize the alternative to the residuum rule, which will better achieve the goals that it was designed to attain:

> "The alternative is to allow agencies and reviewing courts to exercise discretion in determining in the light of circumstances of each case whether or not particular evidence is reliable even though it would be excluded in a jury case. In the exercise of such discretion, agencies and reviewing courts will in many circumstances find that particular hearsay or other so-called incompetent evidence has insufficient reliability. Rejection of the residuum rule does not mean that an agency is compelled to rely upon incompetent evidence; it means only that the agency and the reviewing court are free to rely upon the evidence if in the circumstances they believe that the evidence should be relied upon."

3 Davis, *supra*, at 240. One reason against the rule is that:

> "The reliability of evidence cannot be adequately judged by wholesale thinking that ignores circumstances but must be determined in the light of variable circumstances, including the supporting evidence or lack of it, the opposing evidence or lack of it, the purpose of the proceeding, the practical consequences of a finding either way, the degree of precision needed, the degree of efficacy of cross-examination with respect to a hearsay declaration, and many other such factors."

3 Davis, *supra*, at 241. Because of its flaws, many courts that once applied the residuum rule have now abandoned it.[19] *See* 3 Davis, *supra*, at 239 (citing cases).

---

standards may be highly probative, trustworthy, and useful in the pursuit of truth, are excluded in order to protect confidential relationships that society deems worthy of preserving and fostering. Lilly, An Introduction to the Law of Evidence 317 (West Pub 1978).

[19] *E.g., Calhoun v. Bailar*, 626 F2d 145 (9th Cir 1980); *Johnson v. United States*, 628 F2d 187 (DC Cir 1980); *School Bd. of Broward County, Fla. v. H.E.W., Etc.*, 525 F2d 900 (5th Cir 1976); *Indus. Claims App. Office v. Flower Stop*, 782 P2d 13 (Colo 1989); *Martin v. Police & Firefighters Retire.*, 532 A2d 102 (DC App 1987); *Schmitz v. Iowa Dept. of Human Services*, 461 NW2d 603 (Iowa App 1990); *Embers of Salisbury, Inc. v. A.B.C.C.*, 401 Mass 526, 517 NE2d 830 (1988); *300 Gramatan Ave. Assoc. v. State Div., Etc.*, 45 NY2d 176, 379 NE2d 1183 (1978).

█ The Oregon statutes governing evidence in administrative hearings reject the assumption that hearsay evidence is categorically so unreliable that it cannot be substantial. Hearsay evidence is as admissible under ORS 183.450(1)[20] as any other evidence as long as it meets the statutory test of reliability.[21]

ORS 183.482(8)(c) provides that "[s]ubstantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." That statute makes no provision for weighing some classes of evidence in the record more heavily *as classes* than other classes of evidence in the record — for example, weighing exhibits more heavily than testimony, or nonhearsay testimony more heavily than hearsay — as a matter of law. We agree with the Court of Appeals' reasoning that "[t]he legislature could not have intended that a certain type of evidence, although reliable enough to be admissible under ORS 183.450(1), is *categorically* incapable of being substantial enough to permit a reasonable person to find in accordance with it under ORS 183.482(8)(c)." (Emphasis added.) *Reguero v. Teacher Standards and Practices, supra*, 101 Or App at 34. Accordingly, we reject the residuum rule and affirm the Court of Appeals' holding that hearsay evidence alone, even if inadmissible in a civil or criminal trial, is not incapable of being "substantial evidence" under ORS 183.482(8)(c).

### B. *Substantiality*

Our inquiry does not end there, however. In rejecting the residuum rule, we reject any categorical method of determining substantiality. While our task is not to substitute our judgment for that of the agency, we must decide whether the

---

[20] ORS 183.450(1) provides:

"Irrelevant, immaterial or unduly repetitious evidence shall be excluded but erroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party. All other evidence of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs shall be admissible. Agencies shall give effect to the rules of privilege recognized by law. Objections to evidentiary offers may be made and shall be noted in the record. Any part of the evidence may be received in written form."

[21] Petitioner did not seek review in this case on the question of the admissibility of the evidence relied on by TSPC, and we do not address it.

finding of substantiality is reasonable in the light of counter-vailing as well as supporting evidence. ORS 183.482(8)(c); *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990).

■     ORS 342.143(2), *see supra* note 3, requires the appli-cant to "furnish evidence satisfactory to the commission of good moral character." At the beginning of the hearing, TSPC's attorney conceded that petitioner's application for a teaching license "establishes on its face, at least prima facia [*sic*] showing that the [petitioner] meets the eligibility requirements and so we will go forward in terms of order of proof to show why * * * [petitioner] does not meet the requirements of good moral character." Thus, TSPC con-cluded that petitioner met his burden under ORS 342.143(1) and (2). TSPC was the proponent of the allegation concerning sexual misconduct. ORS 183.450(2) provides:

> "The burden of presenting evidence to support a fact or position in a contested case rests on the proponent of the fact or position."

Thus, TSPC had the burden of presenting substantial evi-dence to support its allegations that petitioner was guilty of sexual misconduct.[22]

■     The "substantial evidence" inquiry necessarily is case specific. Davis suggests, and we agree, that in assessing the substantiality of the evidence or lack of it, variable cir-cumstances may be considered, such as: the alternative to relying on the hearsay evidence; the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding and considerations of economy; the state of the supporting or opposing evidence, if any; the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements; and the consequences of the decision either way.[23]

---

[22] While the dissent suggests that the petitioner had the opportunity to sub-poena the students to testify, it was not the petitioner's burden to do so. Petitioner, therefore, should not be faulted for forcing TSPC to carry its burden.

[23] *See* 3 Davis, Administrative Law Treatise 243 (2d ed 1980). An underlying concern must always be fundamental fairness. *See* Koch, Administrative Law and Practice 470-71 (1985); *Calhoun v. Bailar*, 626 F2d 145, 148 (9th Cir 1980).

"When the alternative to relying on hearsay is to get the better evidence that is readily available, refusing to rely on the hearsay is appropriate." 3 Davis, *supra*, at 243. In this case, there was a convenient and apparently inexpensive alternative to relying on the challenged hearsay. Michelle, Leasa, and the other students apparently were readily available to be called as witnesses. No reason was given why they did not testify. In its summation, TSPC was invited by its attorney "to continue [the] hearing and to direct [the litigants] to bring in these students and hear their testimony directly." TSPC had the authority to issue subpoenas to require the students to testify at the hearing. ORS 183.440(1). It is beyond question that the students' direct testimony is better evidence than their hearsay statements.

■ The importance of the facts asserted in the hearsay statements to the outcome of this proceeding is likewise indisputable. TSPC's findings of fact, conclusions of law, opinion, and order were based *entirely* on hearsay, particularly the hearsay testimony of Castner, Minette, and Costelow.[24] Moreover, Castner, Minette, and Costelow were permitted to express their opinion, based on that hearsay, multiple hearsay, gossip, and rumors, that Michelle and Leasa were telling the truth.[25] "That reliability of particular

---

[24] *See supra* note 14.

[25] In its original order, TSPC made Finding of Fact Number 18:

"Witnesses Costelow, Minette, and Castner all have extensive experience in working with juveniles and all three witnesses have interviewed a large number of children, including children who have been victims of sexual abuse. All three of these witnesses testified that they found Leasa * * * to be truthful in her statements about petitioner."

TSPC decided to "reconsider and withdraw its [original] order" in light of this court's statements in *State v. Isom*, 306 Or 587, 591-92, 761 P2d 524 (1988); *State v. Milbradt*, 305 Or 621, 628-29, 756 P2d 620 (1988); and *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983), that a witness, expert or otherwise, may not give an opinion on whether he or she believes another witness is telling the truth. In its modified order, TSPC deleted Finding of Fact Number 18. TSPC stated that it had "reexamine[d] the record in this case without considering the testimony of witnesses Costelow, Castner and Minette concerning the credibility of Leasa * * * and Michelle * * *." In its modified order, TSPC made Finding of Fact Number 26:

"Witnesses Costelow, Minette, and Castner all have extensive experience in working with juveniles. All three have interviewed a large number of children, including children who have been victims of sexual abuse."

and:

"[TSPC] found the testimony of witnesses Costelow, Castner and Minette to be

evidence must depend upon the quantity and quality of supporting and opposing evidence and on the whole circumstantial setting should be too obvious for argument." 3 Davis, *supra*, at 245.

Evidence in the record countervailing TSPC's findings shows:

1. The only time Leasa made a sworn statement under oath was before the Marion County Grand Jury. At that time, Leasa stated that she had no recollection of petitioner's touching her in the vaginal area. (H)

2. Leasa told Castner that petitioner's touching of Leasa's breast was an accident. (H)

3. The door to petitioner's classroom apparently could not be locked from the inside, contrary to what Leasa's hearsay statement indicated.

4. The classroom in which petitioner allegedly committed inappropriate sexual contact with Leasa was in full public view with large windows on both sides of the room and on the classroom door.

5. Leasa was a student in petitioner's class "less than 10-15 days."

6. A teacher's aide testified that she remained in petitioner's classroom after school the "whole time," except for a few minutes to do some photocopying, and that she never saw Leasa in petitioner's classroom after school.

7. A teacher testified that he usually met with petitioner after school and that he had never seen petitioner alone with Leasa or Michelle.

8. Leasa was upset because many of her friends were transferred out of petitioner's class.

9. Leasa wanted to be transferred out of petitioner's class to be with her friends.

---

credible and persuasive."

Because of the disposition we made in this case, we need not address the propriety of TSPC receiving opinion testimony on the credibility of witnesses.

10. A few days after petitioner reported Michelle to a school counselor for drug abuse and prostitution problems, a school clerical employee overheard Michelle tell Leasa that ''I'm going to get [petitioner].'' (H)

11. Michelle and Leasa were friends.

12. Michelle, Leasa, and the other students whose hearsay statements were received in evidence were friends.

13. Petitioner testified and denied the alleged sexual misconduct.

When unsworn hearsay constitutes the major (in this case, the *entire*) support for the administrative decision, the importance of providing the adversary (here, the petitioner) with the opportunity to test on cross-examination each of the available declarants' perception, memory, narration, and veracity is undeniable. TSPC had no basis for evaluating the credibility of the declarants of the challenged hearsay on which it based its order.

Even where hearsay is sufficiently reliable to be admissible and might be relied on when the consequences of the decision would be minor, that same hearsay might not be relied on when the consequences of the decision would be a profound impact on, for example, the ability of an individual to pursue a chosen profession. The latter is the case here.

TSPC drew several conclusions of law, including that ''[a]ny of these specifications in paragraphs 3, 4, and 5 above, are sufficient alone to support the conclusion that [p]etitioner is guilty of gross neglect of duty and gross unfitness.'' However, while TSPC attempts to establish that each finding is independently adequate to support its decision, each finding relies on, and cannot be supported independently of, the evidence which we determine is not substantial evidence.

Paragraph 3 relies on the finding that petitioner engaged in ''repeated acts of inappropriate contact with female students,'' and paragraph 4 relies on the finding that petitioner engaged in ''sexual contact with Leasa.'' We have determined that these findings are not supported by substantial evidence.

Paragraph 5 concludes that "[p]etitioner is guilty of gross neglect of duty and gross unfitness based on his efforts to persuade female students from his class, including Leasa * * *, to withdraw the allegations against him." This conclusion also relies on the factual findings regarding inappropriate contact with female students which we determine is not supported by substantial evidence. This is necessarily so, because paragraph 5, in isolation, suggests that a person who we must assume was falsely accused of something until proven otherwise can be ineligible for a teaching license for attempting to persuade the accusers to tell the truth. If attempting to persuade someone to tell the truth is a proper basis on which to deny a teaching license or, as paragraph 5 continues, to find that a teacher has "exploit[ed] professional relationships with any student for personal gain, or in support of persons or issues," TSPC must do a better job than it has done thus far of explaining why this is so.

Because the factual findings TSPC made and relied on to reach its conclusions of law are not supported by substantial evidence, the conclusions of law based on those findings are not permissible. We hold that TSPC's decision in this case was not based on substantial evidence under ORS 183.482(8)(c).

## V. DISPOSITION

In sum, TSPC's rule adequately defined the term "good moral character." The evidence in the record, on which TSPC based its findings, however, does not support those findings by substantial evidence. We reverse the decision of the Court of Appeals and the modified order of TSPC and remand this case to TSPC for further consideration.

**PETERSON, J.,** concurring.

I join in the opinion, with this exception. Citing 3 Davis, Administrative Law Treatise 243 (1980), the majority states that, "in assessing the substantiality of the evidence or lack of it, variable circumstances may be considered, such as: * * *." 312 Or at 418. The opinion then lists five "variable circumstances" to consider in assessing the substantiality of the evidence. Application of these factors leads to uncertain results, for the factors themselves are elastic.

I would state this rule: Where the claim and the finding involve conduct that would constitute a crime, hearsay evidence alone is insufficient to establish the conduct.

**VAN HOOMISSEN, J.,** concurring.

I agree with the majority opinion's analysis, conclusion, and disposition in this case.

I write separately to express my concern about an issue raised by petitioner in the Court of Appeals and again in his petition for review. That issue is whether the agency hearing violated due process because the agency's counsel, an assistant attorney general, may have combined prosecutorial and adjudicative functions. The Court of Appeals failed to respond to that issue and this court, in allowing review, expressly declined to review it.

In the context of an APA contested case hearing, ORS 183.413 *et seq*, the dual role of the Attorney General as prosecutor and as legal advisor to the agency on evidentiary and procedural matters is troublesome to me. Assuming that such a dual assignment is permissible in the abstract,[1] the issue remains whether, in this and other cases, the requisite degree of separation of functions is being maintained within the Department of Justice. That is a question this court should address at its first feasible opportunity when the issue has been properly preserved at a hearing and raised on appeal.

**GRABER, J.,** concurring in part; dissenting in part.

I concur fully in the majority's opinion concerning the adequacy of the agency's rule (Part II of the opinion) and in its rejection of the residuum rule (Part IV (A) of the opinion). Nonetheless, I dissent from the majority's disposition of the case, because its opinion analyzes the substantiality of the evidence incorrectly. The majority has — contrary to its proper role and its protestations — conducted its own factfinding. A proper evaluation of the agency's factfinding would lead to an affirmance. I will limit my discussion to three key areas: the role of the burden of proof; the finding that petitioner engaged in an inappropriate sexual contact with Leasa; and the alternative basis for affirmance.

---

[1] ORS 183.450(6) provides that agencies may, at their discretion, be represented at hearings by the Attorney General.

## THE ROLE OF THE BURDEN OF PROOF

At the beginning of its analysis of the substantiality of the evidence in this case, the majority discusses the burden of proof in the TSPC hearing. 312 Or at 417-18. The point of including that discussion is not entirely clear, but the majority seems to suggest that the location of the burden of proof has some bearing on the outcome. If that is the majority's meaning, then I disagree.

In this case, TSPC did not base any of its conclusions on one party's failure to carry an applicable burden of proof. Rather, it made substantive factual findings, which we are to review in the light of the record that was made. The record either does or does not support those findings, no matter where the burden of proof at the hearing may have rested. Indeed, the majority does not list the location of the burden of proof among the circumstances to be considered in assessing the substantiality of evidence, 312 Or at 418, nor does the commentator on whom the majority principally relies, 3 Davis, Administrative Law Treatise 243-46, § 16-6 (2d ed 1980).

Even if the burden of proof were relevant, the burden in this proceeding was on petitioner to establish his good moral character and fitness to serve as a teacher. *See* ORS 342.143 (stating qualifications for teaching license). He applied to reinstate his teaching license. And if, as the majority notes, the students were readily available to be called as witnesses, they were as available to petitioner — who was represented by counsel — as to TSPC. Petitioner had the opportunity to subpoena the students but, for whatever reason, elected not to.

## FINDING OF SEXUAL CONTACT WITH LEASA

The majority ignores TSPC's extensive explanation of why — in the light of conflicting evidence — it made the finding that it did, that "an incident occurred * * * in which petitioner engaged in sexual advances and sexual touching" of Leasa, his sixth-grade student. After finding that those who testified were reliable reporters of the statements that had been made to them, TSPC reasoned:

"[TSPC] rejects petitioner's contention that Leasa made up her claim against petitioner in an effort to help her friend

Michel[l]e * * * 'get' petitioner. In reaching this conclusion, [TSPC] considers the following factors to be significant: (a) Leasa * * * did not come forward on her own with the claim that petitioner had made advances towards her. (b) When Leasa first contacted Principal Miller and asked to be transferred out of petitioner's class, despite being obviously upset and crying, she did not make any accusations against petitioner. (c) When Officer Costelow and Ms. Minette told Leasa * * * they wished to talk to her about a teacher who had a 'touching problem', Leasa stated that she did not wish to get [petitioner] in trouble despite the fact that neither Minette nor Costelow had mentioned petitioner's name. (d) During the course of the investigation, Leasa * * * was reluctant to discuss the incident or to press any allegations against petitioner. Instead she was sympathetic to petitioner and worried about getting petitioner into trouble. (e) When Leasa attempted to withdraw her complaint, she still maintained that the events were true and actually did happen. [TSPC] finds Leasa['s] * * * conduct to be more consistent with that of a child who has been the victim of an attempted sexual assault than that of a child who was attempting to fabricate a story in an attempt to discredit her teacher.

"Tanya Melsha testified that she was almost always present in petitioner's classroom, but the evidence indicates that there were other occasions when Tanya Melsha was absent. [TSPC] finds that there were opportunities for petitioner to have been alone with Leasa * * *.

"[TSPC] is not convinced that all the matters described by Leasa * * * occurred precisely as described by the child. However, the evidence clearly establishes that an incident occurred in which petitioner touched the child in a sexual manner in an attempt to sexually stimulate himself or the child or both."

Every reason expressed by TSPC is borne out by the record. In assessing whether findings are supported by substantial evidence, our task is not to substitute our judgment for that of the agency, but rather to decide whether the findings are reasonable in the light of countervailing as well as supporting evidence. ORS 183.482(8)(c); *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990). The majority demonstrates only that a reasonable person could reach a different result than TSPC did. That demonstration

is beside the point, however, because we are not to review agency findings *de novo*.

There was both supporting and opposing evidence with respect to whether petitioner engaged in sexual contact with Leasa. In support of TSPC's finding, a police officer, a deputy district attorney, and a school counselor testified about Leasa's statements, and the police report containing her complaint was introduced in evidence. Leasa had reported that petitioner had kept her after school one day in September, locked her in the classroom, touched her "on the breast and in the vaginal area," and lowered his trousers. Leasa's statements to the three were similar.

Other supporting evidence included the testimony of another teacher at petitioner's school that she had seen petitioner coming out of his classroom with a girl after school one day, at about the time of the alleged incident, and that both petitioner and the girl looked very serious. Leasa had gone, upset and crying, to the principal and asked to be transferred out of petitioner's classroom. She did not, at that time, say why — only that she never wanted to return to petitioner's classroom again. Petitioner claimed that Leasa had made up a story in order to help Michelle "get" him, but Leasa never came forward on her own with the charge and was always reluctant to speak about it. Leasa was brought into interviews in official settings and responded to questions from potentially intimidating persons in authority, not volunteering the statements in issue. Finally, Leasa never said that the incident did not happen, even when she tried to withdraw her complaint after talking to petitioner.

Opposing evidence included testimony from other teachers that the classroom doors could not be locked from the inside. An aide testified that she usually remained in petitioner's classroom after school and that she had never seen Leasa remain after school alone with petitioner. Another teacher testified that he usually met with petitioner after school and had never seen him alone with Leasa. Petitioner testified and denied that the incident had occurred.

Petitioner's opposing evidence raised questions about the credibility of Leasa's statements. For instance, according to one witness, Leasa said that petitioner had

locked the door to the classroom,[1] whereas other witnesses testified that the door could not be locked from the inside. TSPC was entitled to find, however, that the inconsistencies did not rob Leasa's statements of all credibility.[2] On this record, TSPC's findings about sexual contact with Leasa are reasonable in the light of countervailing as well as supporting evidence.

## ALTERNATIVE BASIS FOR AFFIRMANCE

The majority notes, correctly, that TSPC concluded that any of three grounds, standing alone, independently provided a basis for the decision to deny reinstatement of petitioner's teaching license. TSPC drew these conclusions of law:

"3.  Petitioner's repeated acts of inappropriate contact with female students, his discussion of inappropriate sexual topics, and his employment of sexually suggestive words, gestures, and expressions constitute gross neglect of duty and a serious and material breach of professional responsibilities. Petitioner's actions demonstrate a serious failure to employ professional judgment in violation of OAR 584-20-010(5). This conduct also constitutes gross unfitness.

"4.  Petitioner's sexual contact with Leasa * * * constitutes gross neglect of duty and gross unfitness.

"5.  Petitioner is guilty of gross neglect of duty and gross unfitness based on his efforts to persuade female students from his class, including Leasa * * *, to withdraw the allegations against him. This conduct also violates OAR 584-20-035(1)(b)[,] which requires an educator to refrain from exploiting professional relationships with any student for personal gain, or in support of persons or issues.

---

[1] Other witnesses reported only that Leasa said that she could not get the door to open.

[2] TSPC's modified order stated that the agency was "not convinced that all the matters described by Leasa * * * occurred precisely as described by the child. However, the evidence clearly establishes that an incident occurred in which petitioner touched the child in a sexual manner * * *." If that passage was intended to respond to the conflicting testimony about whether petitioner locked the classroom door, it did so sufficiently. TSPC was not required expressly to resolve the conflict, because it was entitled to decide that a resolution of it was not dispositive. TSPC could have believed, for example, that the door was stuck or that Leasa had been mistaken or panicked.

"6.   Any of these specifications in paragraphs 3, 4, and 5 above, are sufficient alone to support the conclusion that Petitioner is guilty of gross neglect of duty and gross unfitness."

The majority errs, however, in making the unwarranted assumption that the "repeated acts of inappropriate contact with female students" listed as one of several items in Conclusion No. 3 relied on or encompassed Conclusion No. 4, concerning "sexual contact with Leasa." 312 Or at 421. A fair reading of the order as a whole demonstrates that Conclusion No. 3 and Conclusion No. 4 relate to different events, not the same events.

By its unduly restrictive interpretation of TSPC's order, the majority is able to bypass what otherwise would be an insurmountable barrier to its result: the findings that underlie Conclusion No. 3 are not "based *entirely* on hearsay." 312 Or at 419 (emphasis in majority). Many of the pertinent findings are supported by nonhearsay evidence, such as petitioner's own testimony.

(1)   In Finding No. 7, TSPC found that petitioner had put his arm around female students. Petitioner admitted hugging students, male and female. He also admitted that a prior principal had admonished him for hugging a female student.

(2)   In Finding No. 8, TSPC found that petitioner stood close to female students in his classroom and hovered over the backs of his students, with his hands on their desks, in a way that made them uncomfortable. Petitioner admitted standing behind a female student, leaning over and placing his hands on her desk. He also acknowledged that he had been admonished by his most recent principal for that type of act; the written warning to him was introduced as an exhibit.

(3)   In Finding No. 9, TSPC found that petitioner used sexual words, gestures, and winks toward his students. He admitted winking at students and standing so close to other people that they sometimes took a step back. He admitted telling the investigating officer that "these girls all seem to be, you know, they are very interested in sex and in heat half of the time."

(4)   In Finding No. 10, TSPC found that petitioner discussed "french kissing" with his students and asked whether they had "sucked face." Petitioner testified that he had discussed the topic of "french kissing" twice with his students. He testified that he did not initiate the first such conversation but that he could not remember whether he initiated the second one. He testified that "[t]he entire class-room was there. * * * We talked about it in the classroom[,] about 'trading spit' — we talked about it in the classroom — it came out again, you know, about 'sucking face' and I don't remember if I did it or, I mean if I brought on the conversation or somebody else brought on the conversation as to say that so-and-so was sucking face somewheres [sic]."

(5)   In Finding No. 11, TSPC found that petitioner tapped a student on the buttocks with a yardstick, comment-ing that she was looking nice. Petitioner admitted slapping a female student on the buttocks with a yardstick during show-and-tell one Monday morning.

(6)   In Finding No. 15, TSPC found that petitioner touched Michelle, his sixth-grade student, on the breast and that the act was intentional. Petitioner admitted that he touched Michelle's breast. The only dispute was whether he did so intentionally.

Petitioner had various explanations for each of those events and various arguments about why none of them con-stituted a failure to employ professional judgment or an instance of gross unfitness. The crucial point, however, is that the findings concerning those events are based in part on admissions, as well as on hearsay. The majority's sweeping dismissal of all of TSPC's findings as grounded on hearsay is a distortion of the record.

Because TSPC denied relicensing on three indepen-dent grounds, we should affirm its order if any of the three was proper. As demonstrated above, even if nonhearsay evi-dence is required to support the findings in this case, the findings that relate to TSPC's Conclusion No. 3 are supported by substantial evidence. TSPC explained the connection between the findings and the conclusion. Conclusion No. 3 is a permissible conclusion of law based on the pertinent find-ings and the applicable statutes and rules. Accordingly, any

error in the findings concerning Leasa, affecting Conclusion No. 4, is harmless.

In summary, the majority pays lip service to the right legal principles but applies them wrongly in this case. For that reason, I dissent except as stated in the opening paragraph of this opinion.