Argued and submitted October 15, 1998, reversed and remanded July 7, appellant's motion for clarification of disposition filed August 4 and respondent's response filed August 10 granted by opinion September 15, 1999
See 162 Or App 527 (1999)

Daryl JOHNSON,
*Appellant,*

*v.*

CIVIL SERVICE BOARD
OF THE CITY OF PORTLAND,
Portland Parks and Recreation Bureau,
and City of Portland,
*Respondents.*

(9610008072; CA A98841)

985 P2d 854

Susan D. Marmaduke argued the cause for appellant. With her on the brief was James, Denecke, Urrutia & Marmaduke, P.C.

Marianna Kanwit, Deputy City Attorney, argued the cause and filed the brief for respondents.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Petitioner appeals from the circuit court's judgment in a writ of review proceeding, that affirmed the decision of the City of Portland Civil Service Board (CSB) sustaining the City's demotion of petitioner from Rose Curator to gardener. Petitioner asserts, as he did in the circuit court, that the CSB's determination was unsupported by substantial evidence, ORS 34.040(1)(c), that the CSB failed to apply applicable procedures, ORS 34.040(1)(b), and that the CSB misconstrued the applicable law, ORS 34.040(1)(d). We conclude that one of the two determinations of misconduct that underlays petitioner's demotion was not supported by substantial evidence. In particular, in the totality of the circumstances, the CSB erred in relying on unsworn hearsay evidence that was critical to that determination. *Reguero v. Teacher Standards and Practices,* 312 Or 402, 822 P2d 1171 (1991). Accordingly, we reverse and remand.

This dispute arises from the City's demotion of petitioner following the City's investigation and conclusion that petitioner had engaged in public indecency in Washington Park, his primary work site, and other subsequent conduct in violation of supervisory directives and City policy. The specific nature of the alleged misconduct is described more fully below in our discussion of petitioner's assignments of error. In general, in June 1994, petitioner had served as the Rose Curator of the International Rose Test Gardens at Washington Park, a prominent position, for 15 years. On June 27, Portland Police Officer Calder, after receiving a complaint and obtaining an eyewitness identification from a witness, issued petitioner a "Notice of Exclusion from Park or Landmark" (park exclusion). That notice recited that petitioner had engaged in public indecency at Washington Park and barred him from entering the park for 30 days.[1]

---

[1] The Park Exclusion provided:

"On the 27 day of June 1994 at about 4:15 p.m., * * * you violated the State Statute * * * of Public Indecency.

"Because of your conduct, you are hereby excluded from [Washington Park] * * * for a period of 30 days.

"Under the provisions of City Code 20.12.265, you are prohibited from entering or remaining on the property or premises described above for any reason for the above noted period of time.

As a result of his receipt of the park exclusion, petitioner spent a portion of the next morning, June 28, at his attorney's office, seeking legal counsel, and at the Park Commissioner's office, seeking a waiver of the exclusion so that he could return to work. Petitioner failed to promptly inform his immediate supervisor of the park exclusion or of his inability to report to work and, ultimately, on his time sheet for June 28, indicated that he had worked a full day without deducting the time spent conferring with his attorney and while at the commissioner's office.

On September 26, 1994, following an investigation, the City demoted petitioner from the position of Rose Curator to gardener. The City based its decision on its conclusion that petitioner had engaged in public indecency and that petitioner was derelict in his duties by including time spent on personal business in his time records and by failing to inform his supervisor of his inability to report to his primary work site or advise him of the park exclusion. Petitioner appealed his demotion to the CSB.

On March 26, 1996, the CSB held a contested case hearing to determine whether petitioner's demotion was for cause. The City's witnesses included Brian McNerney, petitioner's supervisor, and Officer Calder, who issued the park exclusion.[2] McNerney's testimony focused primarily on the City's investigation and evidence that petitioner's conduct on June 28 violated supervisory directives and City policy.

---

"No Bureau of Police employee or any other City employee (with the exception of the Commissioner of Parks) has the authority to grant you permission to be in or on the above noted property.

"To enter or remain in or on the above noted property during the indicated period of exclusion may result in your arrest for Criminal Trespass in The Second Degree, ORS 164.245.

"You may appeal your exclusion, in writing, to the Codes Hearings Officer, Room 1017, Portland Building, 1120 SW Fifth, Portland Oregon, 97204. To be honored, your written appeal request must be filed within 5 days of receipt of this exclusion notice, and must be accompanied by a copy of this notice.

"Unless you request the presence of the issuing person at the appeal hearing, the Hearings Officer will use the issuing person's sworn statement as evidence at the hearing in lieu of that person's testimony."

[2] Susan DesCamp, assistant to the Parks Commissioner also testified for the City.

Calder testified concerning the events that led to his issuance of the park exclusion. Over petitioner's hearsay objections, Calder testified that a citizen, Andrew Farris, had identified petitioner as one of three individuals whom Farris had seen engaging in sexual conduct in the park. Calder explained how he had met Farris at the park, and that at that point, he believed that Farris had described "some clothing" worn by the men, but that he "[didn't] recall" specifically. Farris did not tell Calder the weight or height or other characteristics of the people he had observed. Calder also testified that he and Farris then walked some distance to the area where Farris said he had seen the activity. Once they reached that area of the park, Calder and Farris observed petitioner at a distance "too far to really tell who [it] was with shadows and stuff," and that Farris, pointing towards petitioner said, "I think that's one of the people involved." Calder then testified that he then went "down the hill after him," handcuffed petitioner and returned to where Farris was standing. At that point, Calder testified, Farris made his initial identification of petitioner and, later, after petitioner had been placed in the patrol car, Farris reiterated the identification. Calder did not ask Farris from what characteristics he had identified petitioner or how long he had observed the three individuals. Calder further testified about observations that he made while investigating Farris's allegations that sexual conduct had occurred and, again over petitioner's objections, described why he believed that Farris was a reliable eyewitness.

Petitioner testified on his own behalf, denying the allegations of public indecency. He testified that 20 to 30 minutes before Calder detained him, he had concluded his work at the park and had been at a nearby area in the park reading and sunbathing. He further testified that, at the time Calder detained him, he was on his way to the Uptown Shopping Center, near Washington Park, to get something to drink. Petitioner testified that he was not trying to elude Calder as he headed down the hill but, rather, that the steep terrain made it necessary to walk fast. Finally, petitioner acknowledged, with respect to his conduct the following day, that he had included in his time sheets the time spent at his attorney's office and the Commissioner's office, but that he

thought that time was work-related because it enabled him to "speed up the process to get back [to] work."[3]

In August 1996, the CSB issued its decision, sustaining the City's demotion of petitioner. The CSB found that petitioner had, in fact, engaged in public indecency in Washington Park and concluded that that conduct and his conduct in response to the park exclusion, which constituted a "serious dereliction of duty," warranted his demotion. The CSB made the following findings of facts:

"3. On June 27, 1994, at approximately 3:50 p.m., Mr. Johnson was observed with two other men engaging in acts of public indecency in Washington Park. One of the witnesses called 911 to report the incident. That witness then left Washington Park with a young niece who had also observed the sexual activity. The other witness, Andrew Farris, remained at the park and met Officer Calder, who responded [to] the 911 call. Based on Mr. Farris' eye witness identification of Mr. Johnson as one of the men observed masturbating and engaging in other acts of public indecency in Washington Park, Officer Calder issued a Park Exclusion to Mr. Johnson. Officer Calder testified there was no doubt in Mr. Farris' mind that Johnson was one of the men he had observed in the park. Officer Calder further testified that in his opinion, Farris was a reliable witness due to several factors. Farris identified Johnson not once but on two occasions without hesitation. After Calder discovered that Mr. Johnson was a Parks Bureau employee, Calder grilled Farris and advised him it was of the upmost importance that he make an accurate identification. Farris' response, made no more than 20 minutes after he first observed Johnson, was that there was no doubt in his mind that Johnson was one of the three men he observed having sex in Washington Park. Farris' identification was also reliable in Calder's opinion as Farris knew exactly where he was going in Washington Park and pointed out the precise location where he had observed Johnson. Moreover, the area Farris described was an area Officer Calder was familiar with as a common site for sexual activity. Officer Calder has over 21 years of experience with the Portland Police

---

[3] Petitioner presented the testimony of other witnesses, including an investigator, Deborah Sirotiak, who spoke with Farris two weeks after the events giving rise to petitioner's demotion, and several individuals who knew petitioner through work or community activities involving rose cultivation.

Bureau and during the last five years, was assigned to the district that includes Washington Park. Calder is familiar with the area and its problems, including problems with public indecency. Although Mr. Johnson denied he was one of the three men observed having sex in the park, based on the record in this matter, it is the Board's determination that Mr. Johnson did engage in the sexual activity for which he was issued a Park Exclusion.

"4. On June 28, 1994, Mr. Johnson did not report to the Washington Park Rose Garden, which was his usual reporting site. Nor did Mr. Johnson contact his supervisor, Brian McNerney, to inform him Johnson was unable to report to the Rose Garden site. On the morning of June 28, Mr. Johnson spent some amount of time at the Ladd's Addition Rose Garden. Johnson also visited the office of his attorney * * *. Although Mr. Johnson initially testified that he visited his attorney on June 27, a review of the tape recording of the investigatory interview regarding this incident refreshed his recollection and he admitted that he had gone to his attorney's office during working hours on June 28. Mr. Johnson also visited the office of Commissioner Hales and spoke to one of Hales' assistants, Susan DesCamp, in order to get the Park Exclusion waived. Mr. Johnson admitted that he went to his attorney's office as well as the office of Commissioner Hales during his regular working hours.

"5. Mr. Johnson did not inform his supervisor of the Park Exclusion. The evidence was uncontradicted that Johnson never volunteered this information to Mr. McNerney and did not admit to the exclusion until McNerney asked him specifically about it.

"* * * * *

"7. As the Rose Curator, Mr. Johnson held a position of considerable responsibility. In addition, the nature of his position was such that he had a high profile in the community representing both the Washington Park Rose Garden and the City of Portland." (Footnotes and citations to record omitted.)

The CSB then considered whether the discipline imposed was warranted. Applying the "no reasonable employer" standard,[4] the CSB concluded:

[4] *See Brown v. Oregon College of Education,* 52 Or App 251, 260, 628 P2d 410 (1981) (discipline will be sustained unless "no reasonable employer would have acted as the employer did in a given situation").

"The activity that led to the Park Exclusion was extremely serious. As a City employee, and particularly as the Curator of the Rose Garden, Johnson exercised very poor judgment by choosing to engage in acts of public indecency in Washington Park. The record is undisputed that Johnson was a 'visible' employee as Curator of the Rose Garden and that Johnson nevertheless chose to engage in public sex in an area where he was visible and, in fact, was observed by two men and their niece. McNerney testified that he was harmed and embarrassed by Johnson's conduct. There was a radio announcement that the Rose Curator had been caught having sex in Washington Park and Susan Des-Camp testified that she had received a call from the Oregonian concerning Johnson's conduct * * *. Officer Calder also testified that Johnson's conduct was exactly the type of behavior Calder and others were trying to eradicate from Washington Park.

"Demotion is also justified by Mr. Johnson's conduct after he received the Park Exclusion. Again, Mr. Johnson exhibited extremely poor judgment. Rather than inform his supervisor the reason he was unable to report to his regular reporting site and request permission to be absent from duty in order to obtain a waiver of the Park Exclusion, Johnson never voluntarily told his supervisor what occurred. Moreover, Johnson used work time to visit both the office of his attorney and the office of Commissioner Hales to deal with the Park Exclusion. Although the time Mr. Johnson spent at his attorney's office and the Commissioner's office was not work-related, Johnson did not use vacation or any other leave to properly absent himself from work. His conduct constituted a serious dereliction in duty. * * *.

"In sum, the serious nature of the incident that led to the Park Exclusion, Mr. Johnson's failure to inform his supervisor of what occurred, and Mr. Johnson's use of work time to conduct personal business all show very poor judgment and justify the demotion."

Finally, the CSB "recommend[ed]" that, although demotion was "appropriate," "in recognition of Mr. Johnson's performance as Rose Curator * * * [he should] be favorably considered in the next hiring for the position of Botanic Specialist/Rose Curator."

In October 1996, petitioner commenced this action by filing a petition for writ of review in the Multnomah County Circuit Court, alleging that the CSB's decision was deficient in several material respects, ORS 34.040, and seeking reversal of the CSB's decision with reinstatement and restitution. ORS 34.100. ORS 34.040 provides, in part:

"(1) The writ shall be allowed in all cases in which a substantial interest of a plaintiff had been injured and an inferior court including an officer or tribunal other than an agency as defined in ORS 183.310 (1) in the exercise of judicial or quasi-judicial functions appears to have:

"(a) Exceeded its jurisdiction;

"(b) Failed to follow the procedure applicable to the matter before it;

"(c) Made a finding or order not supported by substantial evidence in the whole record;

"(d) Improperly construed the applicable law; or

"(e) Rendered a decision that is unconstitutional."

ORS 34.100 provides:

"Upon the review, the court shall have power to affirm, modify, reverse or annul the decision or determination reviewed, and if necessary, to award restitution to the plaintiff, or to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision. From the judgment of the circuit court on review, an appeal may be taken in like manner and with like effect as from a judgment of a circuit court in an action."

Petitioner's petition alleged, *inter alia*: (1) The CSB's finding that petitioner had engaged in public indecency was not supported by substantial evidence, ORS 34.040(1)(c), in that under *Reguero*, the CSB's reliance on Farris's accusations and eyewitness identification was improper. (2) The CSB's reliance on Officer Calder's "vouching" for Farris's reliability failed to comport with applicable procedures, ORS 34.040(1)(b). (3) The CSB's determination that petitioner's conduct following the issuance of the park exclusion was a "dereliction of duty" was not supported by substantial evidence. ORS 34.040(1)(c). (4) The CSB's application of the "no reasonable employer" standard in sustaining the demotion

improperly construed applicable law. ORS 34.040(1)(d). The circuit court, after reviewing the record and engaging in exhaustive colloquy with counsel, rejected each of those allegations and denied the writ.

On appeal, petitioner assigns error to the trial court's rejection of each of the four contentions just outlined. Before reaching the substance of those assignment, we address two threshold considerations. First, what is our standard of review of the circuit court's denial of the writ of review? Second, as a practical matter, what is the relationship among petitioner's various assignments of error and what dispositional consequences flow from each?

■ ORS 34.100 provides that an appeal may be taken from the "judgment of the circuit court on review * * * in like manner and with like effect as from a judgment of a circuit court in an action." In *Caffey v. Lane County,* 75 Or App 399, 401-02, 706 P2d 590 (1985), we construed that provision to dictate not just how an appeal is taken in writ of review cases but how we should review such appeals: "We review on a writ of review in the same 'manner and with like effect as we review a circuit court in an action.'" *Id.* at 402. *Caffey's* instruction is, in truth, enigmatic: What does it mean to *review* "in like manner and with like effect" as in an appeal "from an action"? Ultimately, the answer appears to lie in ORS 34.040(1)(a)-(e), describing each of the "triggers" for the issuance of the writ. Those "triggers" ultimately rest on legal determinations—*e.g.,* whether there is jurisdiction, whether the decision was unconstitutional, etc. Even the determination of whether a finding or order was supported by substantial evidence is circumscribed by legal principles. *See, e.g., Reguero,* 312 Or at 417 (describing standard for determining propriety of relying on hearsay as substantial evidence). Thus, given the issues raised here, and particularly the centrality of *Reguero* to petitioner's substantial evidence challenge, our review of the circuit court's denial of the writ in this case is for errors of law.

■ The second threshold issue, which frames the balance of our analysis and, ultimately, drives our disposition, is the proper relationship among petitioner's assignments of error. As noted, the CSB found two instances of misconduct

warranting the imposition of discipline: the alleged public indecency on June 27, 1994; and petitioner's conduct following the issuance of the park exclusion, particularly on June 28. Petitioner's first and second assignments challenge the CSB's determination with respect to the former instance of misconduct, and his third and fourth assignments are directed against the latter. At oral argument, because we were uncertain as to whether the CSB's order treated either instance of misconduct as an independently sufficient basis for demotion, we asked counsel if reversal and remand would be required if we concluded that either determination of misconduct, but not both, was flawed. Both counsel responded, and we agree, that the CSB concluded that the *combination* of the two instances of misconduct warranted demotion. The CSB did not consider, much less dispute, whether one or the other alone would be sufficient. However, the City, both in its submissions to the CSB and in its submission to the circuit court, conceded that the demotion *was*, in fact, based on the *combination* of misconduct.[5] Thus, if we conclude that either determination of misconduct was fatally flawed, then the appropriate disposition is to reverse and remand to the circuit court to issue the writ of review reversing the CSB's decision and affording whatever further relief may be appropriate under ORS 34.100.

Petitioner's first assignment of error reduces to whether the CSB's reliance on Officer Calder's hearsay recounting of Farris's accusation and eyewitness identification of petitioner passes muster under *Reguero*. Petitioner argues that without that evidence the CSB's determination that petitioner had engaged in public indecency would not be supported by substantial evidence. Petitioner acknowledges that hearsay evidence is admissible and that hearsay *may* constitute substantial evidence. *See Reguero,* 312 Or at 417.

---

[5] For example, in its circuit court brief in response to the petition for the writ, the City stated:

"The decision to demote * * * was not based on these events as independent causes but on [petitioner's] entire course of action, including the conduct that resulted in the exclusion and his conduct after the exclusion. McNerney testified [before the CSB] that the sanction was based on public indecency and [petitioner's] behavior afterwards."

Petitioner argues, however, that under *Reguero,* in the particular circumstances presented here, the hearsay could not constitute substantial evidence.

■ We note, at the outset, that the parties assume that *Reguero* applies to this writ of review proceeding. However, as described below, *Reguero* was decided under the "substantial evidence" review provision of the Administrative Procedures Act (APA), not ORS 34.040(1)(c), which is applicable here. Consequently, before proceeding to the merits of petitioner's *Reguero*-based arguments, we must determine whether the substantial evidence hearsay test established by *Reguero* in the APA setting applies to a writ of review proceeding. For the reasons that follow, we conclude that it does.

ORS 183.482(8)(c), the APA provision for review of an administrative decision for substantial evidence, provides that "substantial evidence in the record" exists to support a finding when "the record, viewed as a *whole,* would permit a reasonable person to make that finding." (Emphasis added.) In *Younger v. City of Portland,* 305 Or 346, 356, 752 P2d 262 (1988), the Supreme Court discussed at length the application of substantial evidence review in the APA setting. Although *Younger* involved a land use decision governed by ORS 197.835(8)(a)(C), its discussion focused *generally* on "substantial evidence review" and the words "whole record" in statutes calling for substantial evidence review. *Id.* at 352-57. The court adopted the view that "statutory references to 'whole' or 'entire' record review are directions to reviewing courts to evaluate the substantiality of supporting evidence by considering *all* the evidence in the record." *Id.* at 356 (emphasis added). *Reguero,* in turn, described the method under the general APA substantial evidence review provisions for evaluating the substantiality of findings supported by hearsay evidence. Although *Reguero* requires application of a specific methodology for reviewing the substantiality of hearsay, its application is, qualitatively, an extension and refinement of substantial evidence review under *Younger*— *i.e.,* both are predicated on review of the entire record. *Reguero,* 312 Or at 417-18, *citing Garcia v. Boise Cascade Corp.,* 309 Or 292, 295, 787 P2d 884 (1990).

ORS 34.040, governing review of writ of review proceedings, includes language similar to that under the APA. It provides that, on review, a finding or order must be supported by "substantial evidence in the *whole record.*" ORS 34.040(1)(c) (emphasis added).[6] Neither *Younger* nor its progeny states whether the standard for substantial evidence articulated in *Younger* applies to writ of review statutes, specifically ORS 34.040. However, the court emphasized, generally, that *"statutory references"* to "whole record" review require consideration of all the evidence and that "no other adequate meaning of the phrase" is plausible, unless the phrase "whole record" is "superfluous." *Younger,* 305 Or at 356. In addition, the court in *Younger* rejected the respondents' contention that certain writ of review cases, *see Menges v. Bd. of Comm.,* 290 Or 251, 264, 621 P2d 562 (1980), *Western Amusement v. Springfield,* 274 Or 37, 44-46, 545 P2d 592 (1976), dictated a different result. Rather, as the court noted, the substantial evidence review in those cases comported with "whole record" review. 305 Or at 356-57.[7]

---

[6] The original antecedent of the present ORS 34.040, enacted in 1862, provided:

"The writ shall be allowed in all cases, where there is no appeal or other plain, speedy and adequate remedy, and where the inferior court, officer or tribunal in the exercise of judicial functions, appears to have exercised such functions erroneously, or to have exceeded it or his jurisdiction, to the injury of some substantial right of the plaintiff, and not otherwise." General Laws of Oregon, ch 7, § 575, p 295 (Deady 1845-1864).

The first substantive amendment to the statute occurred over a century later, when the legislature added the term "or arbitrarily" after the phrase "exercised such functions erroneously." Or Laws 1965, ch 292, § 1.

In 1973, the legislature first added a reference to "substantial evidence":

"The writ shall be allowed in all cases where the inferior court, officer, or tribunal * * * in the exercise of judicial or quasi-judicial functions appears to have:

"* * * * *

"(3) Made a finding or order not supported by reliable, probative and substantial evidence * * *." Or Laws 1973, ch 561, § 1.

Finally, in 1979, ORS 34.040(1)(c) assumed its present "substantial evidence in the whole record" language. Or Laws 1979, ch 772, § 13.

[7] In so concluding, the court noted that writ of review cases that applied an "any evidence" standard of substantial evidence review were decided under a prior version of the writ of review statute, *see* n 6:

"Some decisions of this court have applied an 'any evidence' test or an 'any substantial evidence' test that does not appear to have involved a consideration of the entire record. These decisions, however, involved writ of review cases

We conclude that the substantial evidence review under ORS 34.040(1)(c) is the same as that articulated in *Younger* and applicable in the APA and LUBA settings. It thus follows that *Reguero*'s analysis, with respect to whether hearsay constitutes substantial evidence, pertains here. We turn then to *Reguero*.

In *Reguero,* the petitioner, a teacher who had been terminated, applied to the Teacher Standards and Practices Commission (TSPC) to reinstate his teaching license. At the petitioner's request, the TSPC held a contested case hearing to determine whether the petitioner was fit to serve as a teacher. The TSPC asserted that the petitioner was not of "good moral character" and, in support of that allegation, presented, *inter alia,* evidence that the petitioner had previously engaged in inappropriate sexual conduct with two female students. Neither of the two students testified. Rather, the TSPC introduced "hearsay and multiple hearsay testimony," *id.* at 405, regarding the petitioner's alleged sexual contact with the two students, as well as hearsay regarding student complaints about the petitioner's inappropriate behaviors. That evidence was presented through police reports and the testimony of witnesses who had interviewed the students.

The petitioner testified and admitted that he had inadvertently touched one of the female students, but otherwise denied the allegations. He also presented other countervailing evidence. Relying entirely on the hearsay evidence, the TSPC found that the petitioner had "engaged in inappropriate sexual behavior" with the two students and that he had also engaged in other inappropriate conduct. Consequently, the TSPC concluded that the petitioner lacked "good moral character to serve as a teacher" and denied the petitioner's application for reinstatement of his teaching license.

---

decided prior to amendments permitting review of factual determinations, *see, e.g., City of Portland v. Garner et al,* 226 Or 80, 92, 358 P2d 495 (1961) ('any evidence whatever'); *Smith v. City of Portland,* 25 Or 297, 301, 35 P 665 (1894) ('entire absence of proof'); or review of jury findings, *see, e.g., Wagner v. Kaiser Foundation Hospitals,* 285 Or 81, 84, 589 P2d 1106 (1979) ('any competent evidence'); *Hansen v. Bussman,* 274 Or 757, 763, 549 P2d 1265 (1976) ('any competent evidence')." *Younger,* 305 Or at 357 n 9.

The petitioner sought review, asserting, among other things, that the TSPC's findings were unsupported by substantial evidence in that they were based exclusively on hearsay. We rejected that argument—*i.e.,* that hearsay evidence is *per se* incapable of being "substantial evidence"—and held that there was substantial evidence to support the findings of the TSPC. *Reguero v. Teacher Standards and Practices,* 101 Or App 27, 789 P2d 11 (1990), *rev'd on other grounds* 312 Or 402, 822 P2d 1171 (1991).

■ The Supreme Court affirmed our holding that hearsay evidence is not *per se* incapable of constituting substantial evidence but concluded that, in the particular circumstances presented, the hearsay did not constitute substantial evidence. In so holding, the court described the inquiry for assessing the substantiality of hearsay evidence:

"The 'substantial evidence' inquiry necessarily is case specific. * * * [I]n assessing the substantiality of the evidence or lack of it, variable circumstances may be considered, such as: [1] the alternative to relying on the hearsay evidence; [2] the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding and considerations of economy; [3] the state of the supporting or opposing evidence, if any; [4] the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements; and [5] the consequences of the decision either way." *Id.* at 418.

The court considered each of those variables and concluded that the TSCP erred in relying on the hearsay and, because that hearsay was essential to the TSPC's findings, those findings were not supported by substantial evidence:

"When unsworn hearsay constitutes the major * * * support for the administrative decision, the importance of providing the adversary (here, the petitioner) with the opportunity to test on cross-examination each of the available declarants' perception, memory, narration, and veracity is undeniable. [The agency] had no basis for evaluating the credibility of the declarants of the challenged hearsay on which it based its order.

"Even where hearsay is sufficiently reliable to be admissible and might be relied on when the consequences of the decision would be minor, that same hearsay might not be

relied on when the consequences of the decision would be a profound impact on, for example, the ability of an individual to pursue a chosen profession." 312 Or at 421.

*Reguero*'s balancing of multiple factors is, thus, "case-specific," *id.* at 418; its application is, at least potentially, pliable. *See id.* at 422, (Peterson, J., concurring) ("Application of these factors leads to uncertain results, for the factors themselves are elastic."). Nevertheless, and with respect, we conclude that the circuit court erred in determining that the CSB's reliance on Farris's statements, as recounted by Calder, comported with *Reguero*.

The first *Reguero* factor, "the alternative to relying on the hearsay evidence," militates in favor of consideration of the hearsay. Here, unlike in *Reguero* where the TSPC could have presented the testimony of the hearsay declarant students but failed to do so, the City described its unsuccessful efforts to locate Farris and secure his attendance at the hearing.

Conversely, the second factor, "the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding" militates against reliance on the hearsay. The question of whether petitioner had, in fact, engaged in public indecency was central to the CSB's decision. The only direct evidence on that matter was Farris's statements.

The third factor is "the state of the supporting or opposing evidence, if any." The evidence the City identifies as corroborating Farris's statements includes: (1) Farris had no acquaintance with petitioner and no apparent motive to fabricate; (2) the fact that the area that Farris identified as the location of the activity is one that Calder was familiar with as a common site for sexual activity; (3) petitioner was present in that area within 20 minutes of the initial report; (4) Calder recalled that Farris gave him a "rough description," which he thought included a description of petitioner's clothing; and (5) even when "grilled" by Calder, Farris was adamant that there was "no doubt in his mind" that petitioner was one of the three men he had seen earlier.[8]

---

[8] The City also points to Calder's testimony that petitioner "hurried away" when Calder spoke to him and approached him in the park. The CSB did not,

The controverting evidence, besides petitioner's explanation and denial, *see* 161 Or App at 493-94 was: (1) There were many other people in the park; (2) Calder, while believing that Farris may have given a "rough description" based on petitioner's clothing, could not describe how Farris had initially identified petitioner and conceded that Farris had not described any other identifying features of the three men; (3) petitioner was handcuffed at the time Farris made his face-to-face identification; (4) petitioner's investigator, Sirotiak, testified that when she interviewed Farris two weeks after the alleged incident, he told her that he "could not swear on a Bible" that petitioner was one of the individuals involved in the conduct and that "he did not look long or closely enough to see who was doing what to who[m] or to identify any of the men by their faces."

The corroborating evidence is, thus, far from overwhelming. Although Farris's apparent lack of motive to fabricate and his identification of an area frequented for sexual activity substantially corroborate his statements that he saw *someone* engaging in public indecency, those facts do not, in and of themselves, corroborate the identification of petitioner as one of the participants. Petitioner's presence in the same general area within 20 minutes of the reported conduct and his "hurrying away" tend to corroborate the identification, but only in a general way, given the time lapse, the number of people in the park, and petitioner's explanation for his presence and his actions. Finally, the seemingly most powerful corroboration of the identification—Farris's adamant adherence to the identification under Calder's "grilling"—occurred only after petitioner had been handcuffed and placed in the patrol car.

That, in turn, implicates the fourth factor, "the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements." Eyewitness identification is the quintessential grist of the cross-examiner's mill. *See, e.g., State v. Classen*, 285 Or 221, 232, 590 P2d 1198 (1979) ("[T]he unreliability of eyewitness identifications

---

however, refer to that evidence in its comprehensive findings of fact. As noted, 161 Or App at 493-94, petitioner testified that he did not hear or see the officer and that because he was on a steep slope he had to walk quickly to retain his balance.

under suggestive circumstances is widely recognized."). Here, as in *Reguero,* given the critical importance of Farris's eyewitness identification, and the classic susceptibility of such statements to rigorous cross-examination, the "importance of providing [petitioner] with the opportunity to test on cross-examination [Farris's] perception, memory, narration, and veracity is undeniable." 312 Or at 421.

Finally, the consequences of the CSB's decision were devastating to petitioner. Although petitioner, unlike Reguero, was not entirely deprived of his professional livelihood, he suffered the loss of a publicly prominent position he had held for 15 years, with consequent injury to his reputation.[9] *Compare Pierce v. MVD,* 125 Or App 79, 864 P2d 1355 (1993); *Hause v. MVD,* 127 Or App 421, 873 P2d 374 (1994) (both concluding that DMV's reliance on hearsay in license suspension proceedings comported with *Reguero*).

We conclude that, on balance, and particularly given the essential importance of Farris's statements and eyewitness identification, the potential efficacy of cross-examination, and the severity of the consequences to petitioner of an adverse CSB decision, the CSB's reliance on Farris's statements as substantial evidence was erroneous. We further conclude that, without that evidence, the CSB's determination that petitioner had engaged in public indecency in Washington Park on June 27, 1994, was unsupported by substantial evidence. ORS 34.040(1)(c). Consequently, and for the reasons described previously, 161 Or App at 498-99, the circuit court erred in failing to issue a writ of review reversing the CSB's decision.[10]

Reversed and remanded.

---

[9] Petitioner describes his demotion from Rose Curator to gardener as being tantamount to "relegating the curator of an internationally renowned museum to the role of the caretaker responsible for dusting the exhibits in the warehouse."

[10] Given that disposition, we do not reach petitioner's remaining assignments of error.