Argued and submitted July 1, reversed and remanded with instructions to
reinstate DMV's order October 13, 2004

In the Matter of the Suspension of
the Driving Privileges of

Maria Jimenez PETTEYS,
*Respondent,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES BRANCH (DMV),
*Appellant.*

010128CC; A120755

98 P3d 1138

David F. Coursen, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

No appearance for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

The Driver and Motor Vehicle Services Division[1] (DMV) appeals from a trial court judgment that set aside DMV's order suspending petitioner's driving privileges. It assigns error to the trial court's determination that there was not substantial evidence to support the administrative law judge's (ALJ's) findings that (1) petitioner pulled her vehicle to the side of the highway of her own volition and (2) police officers observed numerous signs of intoxication before they detained her. As did the trial court, we review the entire record to determine whether DMV's order is supported by substantial evidence. ORS 813.450(4)(c). We conclude that it is and reverse and remand with instructions to reinstate DMV's order.

DMV suspended petitioner's driving privileges after she was arrested for driving under the influence of intoxicants (DUII) and refused to take a breath test. Petitioner timely requested a hearing to challenge the suspension. At the hearing, she argued that police officers unlawfully stopped her and that the suspension was therefore invalid. *See Pooler v. MVD*, 306 Or 47, 51-52, 755 P2d 701 (1988) (holding that "an unlawful stop may 'invalidate' an ensuing arrest" and that, "[w]ithout a valid arrest, there can be no request to take a breath test which may lead to a lawful suspension"). Officer Swafford, the arresting officer, was the only witness at the hearing. Officers Lindley and Martin, who first contacted petitioner, did not testify. Lindley, however, described the contact in a written report, which the ALJ admitted into evidence.

The ALJ made the following findings. Around 11:30 p.m., Lindley and Martin saw petitioner turn into the wrong lane of travel on a street in Hood River. They followed her onto I-84 and watched her repeatedly cross over lane lines. Then, "[p]etitioner stopped on the shoulder of the freeway on her own volition." After Lindley approached petitioner, he "noticed that she was displaying signs of intoxication, including an odor of alcoholic beverage, an admission of

---

[1] Although the caption of this case refers to the Driver and Motor Vehicle Services Branch, we use the agency's current title. *See* OAR 735-010-0008.

having consumed two mixed drinks, and watery, bloodshot eyes." Lindley asked petitioner to perform field sobriety tests (FSTs), and petitioner replied that she would like to speak with her attorney first. At that point, Lindley and Martin called Swafford to take over the investigation because he was on DUII patrol. When Swafford arrived at the scene, he, too, observed numerous signs of intoxication. Accordingly, he arrested petitioner for DUII. Petitioner declined a breath test, and Swafford gave her an implied consent form that informed her of DMV's intent to suspend her license.

The ALJ's findings are consistent with Lindley's report and with most of Swafford's testimony. Swafford testified that petitioner was extremely emotional, yelled and screamed, slurred her speech, had a strong odor of alcohol on her breath, had red, bloodshot, watery, and glassy eyes, and admitted that she had consumed alcohol. He also testified that Lindley told him that Lindley had observed those same signs of intoxication before he detained petitioner. Lindley's report contained a similar description of petitioner.

There was, however, one discrepancy between Lindley's report and Swafford's testimony, regarding whether Martin and Lindley signaled petitioner to pull off the highway. Lindley stated in his report, "Before we could make the traffic stop the vehicle pulled over to the side of the road." At the hearing, Swafford described the events leading up to the stop as he understood them based on statements that the two other officers had made to him when he arrived at the scene. Contrary to Lindley's report, Swafford testified that Lindley and Martin activated their overhead lights and stopped petitioner. Swafford also testified about his own encounter with petitioner. He stated that petitioner repeatedly told him that the officers had not pulled her over but that she had pulled over because they were following her and she was scared.

The ALJ concluded that a stop occurred when Lindley asked petitioner to perform FSTs and that the stop was valid on two independent grounds: (1) the officers reasonably suspected that petitioner had driven while intoxicated and (2) the officers saw her commit lane infractions. DMV suspended petitioner's driving privileges for one year.

As noted, the trial court determined that the order was not supported by substantial evidence and set it aside. DMV appeals, renewing its argument that Swafford's testimony and Lindley's report collectively constituted substantial evidence to support the ALJ's findings.

■        Although DMV appeals the trial court's judgment, we review DMV's order directly to determine whether it is supported by substantial evidence. ORS 813.450(4)(c). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). When a finding rests in whole or in part on hearsay evidence, we employ the multifactor analysis prescribed in *Reguero v. Teacher Standards and Practices*, 312 Or 402, 822 P2d 1171 (1991), to test the reliability of that evidence. The nonexclusive list of factors to consider includes

> "the alternative to relying on the hearsay evidence; the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding and considerations of economy; the state of the supporting or opposing evidence, if any; the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements; and the consequences of the decision either way."

*Id.* at 418. The weight given to each factor may vary, depending on the circumstances of the case. *Cole / Dinsmore v. DMV*, 336 Or 565, 585 n 18, 87 P3d 1120 (2004). However, as in all substantial evidence cases—even those that do not involve hearsay—the central inquiry is "whether the finding of substantiality is reasonable in light of countervailing as well as supporting evidence." *Reguero*, 312 Or at 417-18.

In *Reguero*, unsworn hearsay constituted the entire basis for the agency's findings. *Id.* at 419. The Supreme Court identified 13 items of countervailing direct evidence and concluded that the hearsay did not constitute substantial evidence. *Id.* at 420-21. This court distinguished *Reguero* in *Hause v. MVD*, 127 Or App 421, 873 P2d 374, *rev den*, 319 Or 281 (1994), involving facts similar to the ones here. In *Hause*, a motorist challenged the suspension of his driving privileges for failing a chemical breath test. *Id.* at 423. A police sergeant initially stopped the motorist after observing him weave

erratically across two lanes of traffic. The sergeant then called a deputy officer, who later arrested the motorist, to perform field sobriety checks. The motorist challenged the validity of the stop at a hearing at which he and the deputy were the only witnesses. The deputy testified that the sergeant had told him that the sergeant saw the motorist weave; the motorist also testified that he may well have been weaving. An ALJ found that the sergeant saw the motorist weave, and we upheld that finding, noting:

> "In *Reguero*, the agency's finding was based entirely on the hearsay testimony. Here, other evidence in the record supports the agency's determination. Petitioner himself testified that he may well have been weaving. Also, unlike *Reguero*, there is only slight opposing evidence in the record, and no evidence that casts doubt on the hearsay testimony."

*Id.* at 424.

In *Cole/Dismore*, the Supreme Court's most recent decision involving the *Reguero* factors, the court distinguished the two consolidated cases largely on the basis of the state of the supporting and opposing evidence in each. In one case, the petitioner, Cole, offered no evidence to challenge the stopping officer's report. The court reasoned that "Cole's failure to question [the stopping officer's] account of the incident or offer any explanation that countered [the officer's] description of Cole's driving before [the officer] had stopped him tends to support a determination that the report's account of events was reliable." *Cole/Dinsmore*, 336 Or at 586-87 (footnote omitted). The court ultimately concluded that the report constituted substantial evidence. *Id.* at 587. The court distinguished Dinsmore's case by noting that, "[i]n contrast to *Cole*, * * * Dinsmore offered significant evidence contradicting the content of [the hearsay] report[.]" *Id.* at 590. The court further noted that, because Dinsmore offered evidence challenging the trustworthiness of the hearsay at issue, the fourth factor—the efficacy of cross-examination—also distinguished Dinsmore's case from Cole's case. *Id.* The court ultimately concluded that the findings in the Dinsmore case were not supported by substantial evidence. *Id.* at 592.

The foregoing cases demonstrate the principle that the "reliability of particular evidence must depend upon the quantity and quality of supporting and opposing evidence and on the whole circumstantial setting * * *." *Reguero*, 312 Or at 419-20, *quoting* Kenneth Culp Davis, 3 *Administrative Law Treatise* § 16.6, 245 (2d ed 1980). Accordingly, although we examine all of the *Reguero* factors, we give particular weight to the third—the state of supporting and opposing evidence.[2]

■       In this case, the ALJ determined that a stop occurred when Lindley asked petitioner to perform FSTs and that the stop was valid because, at that time, the officers reasonably suspected that petitioner had driven while intoxicated. Those conclusions rest, respectively, on two findings: (1) petitioner "stopped on the shoulder of the freeway on her own volition" and (2) the officers "noticed that she was displaying signs of intoxication, including an odor of alcoholic beverage, an admission of having consumed two mixed drinks, and watery, bloodshot eyes." Because those findings were based partly on the hearsay in Lindley's report, we apply the *Reguero* factors to evaluate the report's reliability as to each finding. We first address whether the report was sufficiently reliable to constitute substantial evidence that petitioner stopped of her own volition on the shoulder of the freeway.

On that issue, three of the *Reguero* factors favor neither party. Although we address them briefly, we give them little weight. The fifth factor—the consequences of the decision either way—is neutral. The Supreme Court has

---

[2] The ALJ weighed the supporting and opposing evidence but did not analyze the remaining *Reguero* factors. The trial court stated in its letter opinion that the ALJ's failure to examine each factor was legal error. Although the trial court set aside the ALJ's order based on the court's conclusion that the order was not supported by substantial evidence and not on its determination that the ALJ erred as a matter of law, we address the latter determination here briefly. We agree with the trial court that the *Reguero* factors should guide the inquiry of whether a hearsay report may constitute substantial evidence. The factors, however, are not "intended to be treated as a checklist." *Cole/Dinsmore*, 336 Or at 585 n 18. The ALJ sufficiently justified his reliance on Lindley's hearsay statements by observing that the record in this case contained more evidence about the events leading up to the stop than existed in cases like *Cole v. DMV*, 172 Or App 132, 17 P3d 573 (2001), *aff'd on other grounds, sub nom Cole/Dinsmore v. DMV*, 336 Or 565, 87 P3d 1120 (2004), in which the evidence consisted of a stopping officer's report that contained only his conclusions and ultimate beliefs.

explained, "Although it is clear that a driver has an interest in maintaining a valid driver license, it is equally apparent that DMV has an interest in removing unsafe drivers from the roads." *Cole/Dinsmore*, 336 Or at 585.

The second factor, which includes the importance of the issue sought to be proved by the hearsay and considerations of economy, cuts in different directions here. Contrary to DMV's contention, the issue when the stop occurred is important. If the officers activated their overhead lights, and thus stopped petitioner, the evidence regarding petitioner's intoxicated appearance could not be considered in determining the stop's validity. Discarding that evidence would make the stop's legality a closer issue. Thus, the issue sought to be proved by hearsay is potentially dispositive. That weighs against relying on the report.

Considerations of economy, however, favor DMV because petitioner could have subpoenaed Lindley. In its analysis of the second *Reguero* factor, the Supreme Court in *Cole/Dinsmore* noted that, "in general, when a party fails to exercise its right to request the agency to subpoena witnesses on its behalf, the agency is not obligated to procure the attendance of those witnesses and may submit reports that they have prepared." 336 Or at 587. The court identified an exception for a party who plans to challenge a report but does not know the author's identity. *Id.* Here, the ALJ found that petitioner knew Lindley's identity before the hearing and had "personally and recently talked to the officer for several minutes." Because petitioner could have subpoenaed Lindley but failed to do so, economy favors relying on the report.

With respect to the first factor—the alternative to relying on hearsay—DMV also had the opportunity to subpoena Lindley. Nothing in the record indicates that Lindley was unavailable to testify. DMV therefore had a viable alternative to its decision to rely on the report. Although that weighs against concluding that the report constitutes substantial evidence, we do not give significant weight to that factor in light of our determination that petitioner also could have subpoenaed Lindley.

Turning to the fourth factor, we conclude that petitioner likely could not have cross-examined Lindley to much

effect. Like the Cole petitioner, petitioner offered no evidence to challenge the veracity of Lindley's report. As a result, it is difficult to discern what she could have gained from cross-examining Lindley. Furthermore, although petitioner did not cross-examine Lindley about his statement that she pulled over of her own volition, petitioner did have an opportunity to cross-examine Swafford about whether Lindley made a contrary statement. Yet, she chose not to pursue that line of questioning. That decision suggests that petitioner did not believe that such a line of questioning would be effective. Thus, the fourth factor favors relying on the report.

As discussed above, we give greatest weight to the third factor—the state of supporting and opposing evidence—which also favors relying on the report. Lindley reported that, "[b]efore we could make the traffic stop, the vehicle pulled over to the side of the road." Again, like the Cole petitioner, petitioner offered no evidence to challenge Lindley's account. To the contrary, like the petitioner in *Hause*, petitioner herself effectively corroborated Lindley's account. As Swafford testified (and petitioner did not dispute), petitioner repeatedly told Swafford that the officers had not pulled her over but that she had pulled over because she was scared. Moreover, unlike the evidence in *Reguero* and *Dinsmore*, the countervailing evidence here is slight. The only contrary evidence is a single statement by Swafford, who was not present at the relevant time, that Martin and Lindley "activated the overhead lights." The trial court concluded that the ALJ improperly discounted that statement. The court explained:

"In this case, I'm troubled by the fact that the hearings officer basically takes a statement in an unsigned report by Officer Lindley—Ms. Petteys did not testify in the hearing—puts [it] in the report and then he bases his findings that that's how the stop was conducted, which is totally inconsistent with what Officer Swafford testified to three or four times based on hearsay statements made to him by officer—and he totally discounted that, but then on other provisions totally accepted Officer Swafford's statements in making his other findings. So I find the hearings officer's totally inconsistent with his—with whatever findings he does adopt, solely to substantiate his report."

We do not agree with that assessment. First, Lindley's report was not the only evidence that he and Martin did not activate their lights. Although petitioner did not testify, her statements to Swafford—which, again, she did not contest—that the officers did not pull her over constituted additional, nonhearsay evidence that the officers, in fact, did not pull her over. *See* OEC 801(4)(b)(A) (a statement made by the party against whom it is offered is not hearsay). Second, Swafford did not testify "three or four" times that Lindley and Martin activated their lights; he made only one such statement as part of a lengthy narrative about the events leading up to the stop. Finally, the ALJ was not inconsistent in discounting one of Swafford's statements while crediting others. The ALJ credited Swafford's testimony of his personal observations and discounted a statement that was based entirely on hearsay and that contradicted both a police report prepared by the stopping officer and petitioner's own statements. That was not inconsistent; rather, it was reasonable based on the totality of the evidence. The quantity and quality of the supporting and opposing evidence thus indicates that the report is reliable.

The trial court also appropriately took into account an additional consideration to supplement *Reguero*'s nonexclusive list of factors: that Lindley neither signed nor dated his report. The court expressed concern that the ALJ's "conclusion that the initial stop was valid was based on an unsigned, undated, computer generated report." Because of Swafford's testimony authenticating the report, we do not give much weight to that consideration. Swafford testified that he asked Lindley to write a supplemental report that Swafford could add to his own. He testified that Lindley did so, that Swafford proofread it the same day, and that the two discussed it after Lindley finished writing it. The ALJ recognized, and we agree, that an unsigned, undated report is not as reliable as one more formally executed. The ALJ concluded, however, that Swafford's testimony sufficiently authenticated the report to justify its admission into evidence. Because the report was prepared in the ordinary course of police business, properly authenticated, and substantiated by other, nonhearsay evidence, we agree with the ALJ's conclusion.

In sum, because petitioner's own statements to Swafford that she pulled over of her own volition corroborate Lindley's report and because the other *Reguero* factors do not preponderate differently, we conclude that the report is sufficiently reliable to constitute substantial evidence in support of the determination that Lindley and Martin did not stop petitioner when she pulled off the highway. The ALJ correctly concluded that a stop did not occur until Lindley asked petitioner to perform FSTs.

We next turn to the finding underlying the ALJ's conclusion that the officers reasonably suspected at the time of the stop that petitioner had driven while intoxicated. The ALJ found that, before they stopped petitioner, the officers "noticed that she was displaying signs of intoxication, including an odor of alcoholic beverage, an admission of having consumed two mixed drinks, and watery, bloodshot eyes." Because that finding was based in part on Lindley's report, we return to the *Reguero* factors. Our application of those factors to that finding is identical to our previous analysis, except that there is more evidence to support, and none to oppose, that finding.

Specifically, three pieces of evidence support the finding that Lindley noticed signs of intoxication before he asked petitioner to perform FSTs. First, Lindley stated in his report that he smelled alcohol on petitioner's breath and that petitioner admitted that she had consumed two mixed drinks. Second, Swafford testified that Lindley told him at the scene that, when Lindley first spoke to petitioner, he "noted that she had red, bloodshot, watery eyes, extreme odor of unknown alcoholic beverage, [and] admission to alcoholic consumption." Furthermore, Swafford testified that, when he arrived at the scene a few minutes after Lindley stopped petitioner, Swafford personally observed those same signs of intoxication and petitioner made the same admission that she had consumed two mixed drinks. No evidence in the record contradicts either the report or Swafford's testimony.

In light of the quality and quantity of corroborating and opposing evidence, we conclude that the report is reliable and constitutes substantial evidence that Lindley observed numerous signs of intoxication before he stopped petitioner.

The ALJ correctly concluded that Lindley reasonably suspected petitioner of driving while intoxicated when he stopped her and that the stop therefore was valid. *See State v. Berg*, 140 Or App 388, 914 P2d 1110 (1996) (a police officer has reasonable suspicion to believe that a motorist has driven while intoxicated where the officer observes the motorist's bloodshot eyes and smells alcohol on the motorist's breath). Because we conclude that the stop was valid based on reasonable suspicion of DUII, we do not address the ALJ's alternative conclusion that the stop was valid because the officers observed lane infractions.

Reversed and remanded with instructions to reinstate DMV's order.