Argued and submitted February 4, affirmed October 19, 2011

Ross DAY
and David Hunnicutt,
*Petitioners,*

*v.*

ELECTIONS DIVISION OF
THE SECRETARY OF STATE,
*Respondent.*

Elections Division of the Secretary of State
2005520; A141017

265 P3d 16

Ross Day argued the cause for petitioners. With him on the briefs was Common Sense for Oregon, Inc.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Rosenblum, Senior Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Petitioners Day and Hunnicutt were the chief petitioners responsible for the circulation and submission of Initiative Petition 57 (2006). They seek review of a final order of the Secretary of State assessing a civil penalty of $250 against each of them for violating OAR 165-014-0260(5) (Oct 15, 2003),[1] which requires the chief petitioners of an initiative to insure that the persons to whom they delegate the task of obtaining signatures on the petition do not violate Article IV, section 1b, of the Oregon Constitution. That constitutional provision makes it "unlawful to pay or receive money or other thing of value based on the number of signatures obtained on an initiative or referendum petition." On review, petitioners contend, among other things, that the secretary's order was not supported by substantial evidence in the record. Specifically, petitioners contend that there is insufficient evidence that (1) signature gatherers for Initiative Petition 57 were paid by the signature rather than by the hour and (2) petitioners failed to insure that their agents complied with Article IV, section 1b. We conclude that the order was supported by substantial evidence and affirm.[2]

The following facts are undisputed. Petitioners contracted with Democracy Direct Inc. (DDI) to gather signatures for Initiative Petition 57. That contract prohibited DDI from paying petition circulators on a per-signature basis. In addition, prior to entering into the contract with DDI, petitioners had a conversation with Trickey, the president of DDI, concerning the practices and procedures to be followed in gathering signatures. DDI then contracted with B & P Campaign Management, Inc. (B & P) to gather signatures for several initiatives, including Initiative Petition 57. B & P employed, among other people, Otti and Jurow to circulate petitions for that initiative.

After petition circulation commenced, petitioners periodically received status updates from Trickey on the

---

[1] OAR 165-014-0260 was amended subsequent to the conduct at issue in this case, and subsection (5) was renumbered as subsection (4). *See* OAR 165-014-0265 (Dec 31, 2007). Because the conduct at issue occurred in 2005, all references to the rule are to the version effective October 15, 2003.

[2] We reject petitioners' remaining assignments of error without discussion.

progress of signature gathering for Initiative Petition 57. During those discussions, Trickey provided oral assurances that DDI and B & P were complying with Article IV, section 1b. Petitioners relied on those assurances; they made no request for documents, had no direct interaction with B & P, and did not review any payroll records.

The Elections Division of the Secretary of State received a formal complaint alleging that petitioners had violated the pay-per-signature ban in OAR 165-014-0260 and Article IV, section 1b. After an investigation, the Elections Division issued a notice of a proposed civil penalty, and a contested case hearing was held. A hearings officer ultimately issued a proposed order concluding that petitioners had violated the pay-per-signature ban. Specifically, the hearings officer found that two of B & P's employees—Otti and Jurow—were paid by the signature while circulating petitions for Initiative Petition 57 and that petitioners had failed to "insure that [B & P] complied with Article IV, section 1b of the Oregon Constitution," as required by OAR 165-014-0260. Consequently, the hearings officer imposed a civil penalty of $250 against each of petitioners. The Secretary of State adopted the hearings officer's findings and conclusions in its final order.

Petitioners now seek judicial review of that order. Before we address petitioners' arguments, a review of the legal context of the dispute is helpful. Article IV, section 1b, provides:

"It shall be unlawful to pay or receive money or other thing of value based on the number of signatures obtained on an initiative or referendum petition. Nothing herein prohibits payment for signature gathering which is not based, either directly or indirectly, on the number of signatures obtained."

The Elections Division of the Secretary of State promulgated a rule to effectuate that constitutional provision. OAR 165-014-0260 provides, in part:

"(1)   The purpose of this rule is to interpret Article IV, section 1b of the Oregon Constitution * * *.

"* * * * *

"(3)   Section 1b bans the practice of paying circulators or others involved in an initiative or referendum effort if the basis for payment is the number of signatures obtained. This means that payment cannot be made on a per signature basis. * * *

"* * * * *

"(5)   The phrase 'directly or indirectly' in Section 1b means that the chief petitioners who are responsible for the circulation and submission of the initiative or referendum petition cannot directly pay for signature gathering based on the number of signatures obtained, and *cannot contract or delegate to another person or entity to obtain signatures and allow the third party to pay circulators on the basis of the number of signatures obtained.* However, chief petitioners may contract with a person or entity to manage the signature gathering, and pay the person or entity for services, including the service of qualifying the petition for the ballot, so long as the individuals who actually circulate the petition are not paid based on the number of signatures obtained. *The chief petitioners are responsible for insuring that agents of the chief petitioner (anyone who is delegated the task of obtaining signatures on the initiative or referendum petition) do not violate Section 1b.*

"(6)   Violations of Section 1b will be processed under ORS 260.995 as civil penalties. Penalties may be assessed against chief petitioners or any other persons who either directly or indirectly pay circulators based on the number of signatures obtained. Liability may be imposed on chief petitioners as provided in ORS 260.561."

(Emphases added.)

On review, petitioners contend that the secretary's order was not supported by substantial evidence. Petitioners challenge the secretary's findings that (1) two petition circulators employed by B & P were paid by the signature and (2) petitioners failed to ensure that petition circulators were not paid by the signature, as required by OAR 165-014-0260. As to the first finding, petitioners argue that the only evidence that Otti and Jurow were paid by the signature is hearsay evidence, which we should disregard in light of the "overwhelming countervailing evidence" that they were paid by the hour. As to the second finding, petitioners argue that they

satisfied the requirements of OAR 165-014-0260 by contractually prohibiting DDI from violating Article IV, section 1b, and by obtaining oral assurances from Trickey that subcontractors were complying with the constitutional mandate.

Under ORS 183.482(8)(c), we are required to set aside an agency order in a contested case if we determine "that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." In making that assessment, we do "not substitute [our] judgment for that of the agency as to any issue of fact or agency discretion." ORS 183.482(7).

Here, the secretary's finding that circulators of Initiative Petition 57 were paid by the signature was based primarily on hearsay and multiple hearsay evidence. That hearsay evidence consisted of statements made by Otti and Jurow to a Department of Justice (DOJ) investigator and to the Bureau of Labor and Industries (BOLI) for the purpose of pursuing wage and hour complaints against B & P. Some of the statements were written by Otti and Jurow and some were contained in reports written by investigators. In substance, the statements asserted that Otti and Jurow had been promised an hourly wage of $14 or $15 per hour, but that their actual pay had been retroactively reduced based on the number of signatures obtained on each petition. According to Otti and Jurow, they had not been asked to document their hours and were paid in cash. Neither individual testified at the hearing.

In general, hearsay evidence may be admitted and considered in an administrative proceeding, ORS 183.450(1), and may by itself amount to substantial evidence. *Reguero v. Teacher Standards and Practices*, 312 Or 402, 417, 822 P2d 1171 (1991) ("[H]earsay evidence alone, even if inadmissible in a civil or criminal trial, is not incapable of being 'substantial evidence' under ORS 183.482(8)(c)."). To determine whether hearsay evidence is sufficiently reliable to constitute substantial evidence, we follow the case-specific inquiry announced in *Reguero*:

> "[I]n assessing the substantiality of the evidence or lack of it, variable circumstances may be considered, such as: the alternative to relying on the hearsay evidence; the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding and considerations of economy; the state of the supporting or opposing evidence, if any; the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements; and the consequences of the decision either way."

*Reguero,* 312 Or at 418. Cases applying *Reguero*

> "demonstrate the principle that the reliability of particular evidence must depend upon the quantity and quality of supporting and opposing evidence and on the whole circumstantial setting * * *. Accordingly, although we examine all of the *Reguero* factors, we give particular weight to the third—the state of supporting and opposing evidence."

*Petteys v. DMV,* 195 Or App 644, 650, 98 P3d 1138 (2004) (citations and internal quotation marks omitted).

Here, the first *Reguero* factor does not favor either party. The record is silent on whether Otti and Jurow, the hearsay declarants, were available to testify at the hearing; thus, there may have been a viable alternative to relying on the hearsay evidence. However, petitioners did not object to the admission of the hearsay statements at the hearing and, consequently, the agency was not alerted to the need to pursue an alternative. The weight of this factor is furthered diminished by the fact that petitioners, too, could have subpoenaed Otti and Jurow to testify. *See Petteys,* 195 Or App at 651 (declining to give significant weight to the first factor because, although the agency could have subpoenaed the hearsay declarant, "petitioner also could have subpoenaed [him]").

The second factor—the importance of the facts sought to be proved by the hearsay evidence and considerations of economy—does not strongly favor either party. On the one hand, the facts sought to be proved are paramount to the outcome of the case: without a finding that petition circulators for Initiative Petition 57 were paid by the signature, there is no basis for penalizing petitioners. On the other hand, considerations of economy militate in favor of relying

on the hearsay. The Supreme Court has noted that, "in general, when a party fails to exercise its right to request the agency to subpoena witnesses on its behalf, the agency is not obligated to procure the attendance of those witnesses and may submit reports that they have prepared." *Cole/Dinsmore v. DMV*, 336 Or 565, 587, 87 P3d 1120 (2004); *see also Petteys*, 195 Or App at 651 (applying that principle to conclude that, "[b]ecause petitioner could have subpoenaed [the police officer] but failed to do so, economy favors relying on the report"). Here, petitioners could have subpoenaed Otti and Jurow or the investigators who prepared the reports, *see* ORS 183.440 (providing for subpoenas in contested cases), but failed to do so.

Similarly, the fourth factor—the efficacy of cross-examination—which we discuss out of turn, does not bear heavily in this case. Although Otti and Jurow repeated their statements to multiple people, and those statements were consistent, we cannot say that cross-examination would have been without effect. Nonetheless, because petitioners concede that "this *Reguero* factor is a push," we do not analyze it further.

The fifth factor—the consequences of the decision—also has little bearing on our consideration of the hearsay in this case. The immediate impact of the decision on petitioners, a $250 fine, is far less severe than the consequences cited in *Reguero*, where the petitioner was deprived of his ability to pursue his chosen profession, or other cases involving the suspension or revocation of a license. *See, e.g., Hause v. MVD*, 127 Or App 421, 873 P2d 374, *rev den*, 319 Or 281 (1994); *Pierce v. MVD*, 125 Or App 79, 864 P2d 1355 (1993). Moreover, the Elections Division has an interest in ensuring that initiative and referendum petitioning is conducted in a manner that comports with election laws. *See* ORS 246.046 ("The Secretary of State * * * shall diligently seek out any evidence of violation of any election law."); *see also Cole/Dinsmore*, 336 Or at 585 (noting, on review of an order suspending a petitioner's driving privileges, that "[a]lthough it is clear that a driver has an interest in maintaining a valid driver license, it is equally apparent that DMV has an interest in removing unsafe drivers from the roads").

Finally, the third factor—the state of supporting and opposing evidence—favors relying on the hearsay statements. Petitioners offered only marginal countervailing evidence at the hearing. On appeal, they point to several exhibits that they contend make it improbable that B & P was paying petition circulators by the signature: various "invoices" from B & P to DDI that enumerate charges for signature gathering on an hourly basis; employment agreements with several B & P employees (but not Otti and Jurow) that contemplate payment on an hourly basis; a DOJ investigator's report recounting the statements of several B & P employees who said they were paid on an hourly basis; a B & P advertisement seeking petition circulators and offering an hourly wage; and "timesheets" that, according to petitioners, indicate that circulators were paid an hourly wage. However, none of that evidence, even if taken at face value, contradicts or calls into question the veracity of Otti's and Jurow's statements.

As noted, Otti's and Jurow's hearsay statements alleged that they were promised an hourly wage but that, when their productivity did not meet the minimum signature gathering requirements of B & P, their wage was retroactively reduced to reflect fewer hours of work. Thus, they asserted that, in effect, they were paid by the signature. The fact that the record contains employment agreements to pay employees by the hour is consistent with what Otti and Jurow said they were promised. The agreements simply provide,

"I * * * understand that I am being paid an hourly rate of $14.00/hour for signature collection on [certain named petitions]. For my work on circulating these petitions, I am expected to maintain an average of 6 signatures an hour on each of the four above listed petitions. Failure to maintain this average signature rate will lead to termination."

Those employment terms are identical to the terms described by Otti and Jurow in their hearsay statements. They did not allege that B & P was openly paying petition circulators by the signature; rather, they alleged that they were denied their hourly wage after the fact, *i.e.*, after their productivity did not meet expectations. The employment agreements fail

to discredit those allegations. The advertisement cited by petitioners suffers from the same infirmity.

The statements of some B & P employees made to a DOJ investigator are likewise unhelpful to petitioners. Although the employees stated that they were paid based on the number of hours worked, they also stated that they had no problem meeting the signature "quota" imposed by B & P. Otti and Jurow, on the other hand, were not paid the promised wage precisely because they did not meet B & P's signature gathering expectations. Thus, the statements made to the DOJ investigator are not inconsistent with the challenged hearsay evidence.[3] To the extent petitioners use those statements to argue that it is unlikely that B & P paid only two petition circulators by the signature, we note that there are statements from several other B & P employees in the record alleging that they were paid by the signature rather than by the hour, although those petition circulators did not work on Initiative Petition 57.

The "timesheets" referenced by petitioners are not timesheets kept by employees but are, in most cases, handwritten notes made by B & P management containing circulators' names, the number of signatures gathered on each petition, and, in some cases, hours worked or a monetary amount. At least one sheet contains both a column for "earned pay" (apparently based on the number of signatures gathered) and a column for "hours pay." The significance of the documents is not readily discernible and in no case do they confirm what was actually paid to petition circulators. So far as the record indicates, no actual payroll records exist (presumably owing to the fact that petition circulators were paid in cash). Nor do the invoices from B & P to DDI indicate what was paid to petition circulators; rather, those invoices only indicate the total number of hours spent on signature gathering. Again, the fact that some, or even most, petition circulators were paid by the hour is not inconsistent with the hearsay statements of Otti and Jurow. The exhibits relied on

---

[3] We also note that the statements cited by petitioners are hearsay of the same variety as Otti's and Jurow's statements. Moreover, those statements were made at the invitation of B & P management after they were aware that a complaint had been filed against them.

by petitioners do not undermine the reliability of the challenged hearsay evidence.

In addition to the hearsay statements of Otti and Jurow, the secretary's order relied on a judgment entered against B & P on BOLI's complaint that B & P violated wage and hour laws. Although that judgment does not establish that any petition circulators were paid by the signature, the order notes that "it tends to establish that B & P was not operating according to wage and hour laws" and "adds weight to the finding that [Otti and Jurow] were paid by the signature." The order further explains, "Any concern that the Elections Division is relying on hearsay is alleviated by the fact that these statements are records of state agencies, thus giving them an indicia of reliability."

In light of the quantity and quality of the supporting and opposing evidence, we conclude that the hearsay evidence was reliable. Accordingly, the secretary's finding that Otti and Jurow were paid based on the number of signatures they obtained was supported by substantial evidence.

We next address petitioners' contention that there was not substantial evidence to support the secretary's finding that petitioners violated OAR 165-014-0260(5). The secretary found,

"[T]he plain meaning of 'insure' is to make sure, or certain. Therefore, under OAR 165-014-0260, petitioners' obligation is to make sure or certain that their agents comply with section 1b.

"Merely requiring compliance in a contract with a prime contractor is not sufficient to make sure or certain that subcontractors of the primary contractor are complying with Article IV, section 1b. Similarly, relying on verbal assurances from the prime contractor that his sub-contractors are in compliance is not sufficient to be sure or certain that the subcontractors are in compliance. This is particularly true where petitioners made no effort to review the records of the sub-contractor. * * *

"* * * * *

"In short, petitioners' only attempt to insure compliance with Article IV, section 1b by its agents was to require that compliance in a contract with [DDI] and to rely on Mr. Trickey's assurances that he was complying with the

contract. These are insufficient actions to insure that all sub-contractors and their employees are complying. At the very least, petitioners needed to make efforts to independently verify that all its agents were complying. Petitioners made absolutely no independent efforts to insure compliance. I find that petitioners failed to insure that its agents complied with Article IV, section 1b."

We note at the outset that petitioners do not assign error to the secretary's interpretation of the rule, *i.e.*, that a chief petitioner must "make efforts to independently verify that all the agents were complying." Instead, petitioners argue only that there was not substantial evidence that they violated the rule. To the extent petitioners incidentally challenge the secretary's interpretation of the rule within other assignments of error, that argument is undeveloped and thus we do not address it. *Friends of the Columbia Gorge v. Columbia River Gorge*, 236 Or App 479, 505 n 17, 238 P3d 378 (2010), *rev den*, 349 Or 654 (2011) (declining to consider undeveloped arguments). Normally, we defer to an agency's plausible interpretation of its own rule unless it is inconsistent with the wording or context of the rule or with any other source of law. *Friends of Sam Chase v. Elections Division*, 234 Or App 276, 280-81, 227 P3d 209 (2010) (citing *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994)). Petitioners have not advanced an argument under that rubric, and we decline to do so on their behalf.

The issue thus reduces to whether there was substantial evidence that petitioners failed to independently verify—by reviewing records or otherwise—that B & P was complying with Article IV, section 1b. Petitioners, according to their own testimony, merely relied on the oral assurances of Trickey that B & P was complying with Article IV, section 1b. They made no independent effort to insure that B & P was not paying petition circulators by the signature. Consequently, there is substantial evidence to support the secretary's finding that petitioners violated OAR 165-014-0260.

Affirmed.